UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/6/2024__
```

------------------------------------------------------------------X
                 :
MARILYN BLANCO, et al.,         :
                 :
        Plaintiffs,    :
                 :     23-cv-01652 (LJL)
     -v-           :
                 :    OPINION AND ORDER
SUCCESS ACADEMY CHARTER SCHOOLS, INC., et :
al.,                 :
                 :
        Defendants.   :
                 :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

   Defendants Success Academy Charter Schools, Inc. ("Success Academy"), Success

Academy Charter School Harlem 2 ("Harlem-2"), Success Academy Chief Executive Officer

("CEO") Eva Moskowitz ("Moskowitz"), Harlem-2 Principal Amelia Cohen ("Cohen"), and

Harlem-2 Assistant Principal Carlos Alvarez ("Alvarez," and together with Success Academy,

Harlem-2, Moskowitz, and Cohen, "Defendants"[1]) move, pursuant to Federal Rule of Civil

Procedure 12(b)(6), to dismiss the first amended complaint for failure to state a claim for relief.

Dkt. No. 41.  Defendants also seek to dismiss the claims against Alvarez under Rule 12(b)(5) for

insufficient service of process.  *Id.*  For the following reasons, the motion is granted.

---

[1] Plaintiffs also name four "John Does" in the caption of their amended complaint, but make no
allegations about any of them.  *See* Dkt. No. 35.  Simply listing unidentified defendants in a
complaint's caption without making a single allegation as to their involvement in the conduct at
issue is insufficient to state a claim.  *See, e.g.*, *Antrobus v. New York City*, 2023 WL 6609443, at
*6 n.4 (S.D.N.Y. Oct. 10, 2023) ("Any defendants named in the caption must also be discussed
in Plaintiff's statement of claim."); *Brown v. Annucci*, 2017 WL 1040416, at *4 (N.D.N.Y. Mar.
16, 2017); *see also Casino v. Rohl*, 2014 WL 5425501, at *6 (E.D.N.Y. Oct. 23, 2014).

## BACKGROUND

For purposes of this motion, the Court accepts as true the well-pled allegations of the first amended complaint ("FAC" or the "Complaint") as supplemented by the documents incorporated by reference.

Plaintiff I.B. ("I.B.") is a seven-year-old child who suffers from Attention Deficit Hyperactive Disorder ("ADHD"). Dkt. No. 35 ¶¶ 2, 7. Plaintiff Marilyn Blanco ("Blanco," and together with I.B., "Plaintiffs") is I.B.'s mother and legal guardian. *Id.* ¶ 6. Plaintiffs reside in the Bronx. *Id.* ¶¶ 6–7.

Harlem-2 is a public charter school located in the Harlem neighborhood of Manhattan, and is wholly controlled and operated by Success Academy, a non-profit corporation organized under the laws of Delaware that receives direct funding from the federal government and the State of New York and resources from the City of New York. *Id.* ¶¶ 8–9, 14; *see also id.* ¶ 1. Success Academy operates forty-seven schools across New York City. *Id.* ¶ 8. Defendant Moskowitz is the CEO of Success Academy and has decision-making authority over Success Academy. *Id.* ¶ 12. Defendant Cohen is the Principal of Harlem-2 and an employee of Success Academy. *Id.* ¶ 10. Defendant Alvarez was, at all relevant times, the Assistant Principal of Harlem-2 and an employee of Success Academy. *Id.* ¶ 11.[2]

---

[2] In their Fifth Cause of Action for municipal and supervisory liability, Plaintiffs also refer to "the Board of Trustees," presumably of Success Academy. Plaintiffs do not specify whether the Board of Trustees is a separate legal entity from Success Academy at all. But Plaintiffs fail to name or define the Board of Trustees as a defendant in the caption of the FAC. It may well be the case that "simply naming a defendant in the Complaint" is "generally sufficient to make that identified defendant a party to the case," *Steinmetz v. Danbury Visiting Nursing Ass'n*, 2021 WL 4193070, at *3 (D. Conn. Sept. 15, 2021), but here, Plaintiffs do not name the Board of Trustees as a defendant in the caption of their Complaint. And while a complaint's caption "itself is normally not determinative of the identity of the parties," *E.E.O.C. v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Loc. 580*, 139 F. Supp. 2d 512, 524 (S.D.N.Y. 2001) (quoting *Nationwide Mut. Ins. Co. v. Kaufman*, 896 F. Supp. 104, 109 (E.D.N.Y. 1995)), Plaintiffs' (counseled) filings fail to manifest intent to name the Board of Trustees as a defendant

I.B. began kindergarten at Harlem-2 during the 2020–2021 school year, *id.* ¶ 16, and attended Harlem-2 until Blanco withdrew him from the school in May 2023, *id.* ¶¶ 17, 69. Plaintiffs claim that, based on his disability, I.B. was subject to a "campaign of harassment" through, *inter alia*, several suspensions at Harlem-2 beginning in December 2021 until his withdrawal from the school. *Id.* ¶ 18.  In February 2022, Blanco, with Harlem-2's knowledge, "began seeking psychiatric help and diagnosis for I.B.," but the suspensions nevertheless escalated in length and frequency. *Id.* ¶¶ 19–20.  On March 1, 2022, Blanco met with Alvarez to discuss putting I.B. on an Individualized Education Program ("IEP").[3]  *Id.* ¶ 20.  The following day, Alvarez called Blanco and asked her to pick I.B. up from school.  *Id.* ¶ 23.  When Blanco arrived at the school, Alvarez informed Blanco that Harlem-2 "could not have I.B . . . in the building," and that the school was not a "good fit" for I.B.  *Id.*  Between March 4, 2022 and March 17, 2022, I.B. received six suspensions, each for five days.  *Id.* ¶¶ 26–29.  I.B. did not immediately serve any of the suspensions and remained in school because, under the Individuals

---

as they did not include the Board of Trustees in their list of defendants in the Complaint, *see* Dkt. No. 35 ¶¶ 8–12 (naming as defendants Success Academy, Harlem-2, Cohen, Alvarez, and Moskowitz), did not submit an affidavit of service indicating that service has been effected on the Board of Trustees, and do not appear to have actually effected service on the Board of Trustees, *see, e.g.*, *Shider v. Commc'ns Workers of Am., Loc. 1105 (NYNEX)*, 1997 WL 470112, at *5 (S.D.N.Y. Aug. 15, 1997) (Sotomayor, J.) (examining "the caption, pleadings, service of process, and other indications of [the] plaintiff's intent" to determine "whether an entity ha[d] properly been made a party to a lawsuit").  And without proper service, the Court lacks personal jurisdiction over a defendant.  *See, e.g.*, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).  Accordingly, Plaintiffs' filings are insufficient to infer intent to name the Board of Trustees as a party.  The Court thus understands the FAC to not allege claims against the Board of Trustees.  To the extent that Plaintiffs intend to bring claims against the Board of Trustees as a separate entity, those claims are dismissed without prejudice for failure to effect timely service.  Fed. R. Civ. P. 4(m).

[3] An IEP is "a written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'"  *D.D. ex rel. V.D. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).

with Disabilities in Education Act ("IDEA"), children with disabilities cannot be removed from school until a Manifestation Determination Review ("MDR") takes place to determine if the behavior leading to the suspension is connected to the child's disability. *Id.* ¶¶ 27, 29; *see* 20 U.S.C. §§ 1415(j), (k)(1)(E)–(F).[4]  On March 17, however, the school held the first MDR meeting and found that I.B.'s behavior was not a manifestation of his disability.[5]  Dkt. No. 35 ¶ 31.  On March 18, Cohen told Blanco that I.B. was required to start serving fifteen days of the forty days of accumulated suspension time, even though I.B. had only accumulated thirty days. *Id.*  But on March 31, 2022, the school held another MDR meeting, and this time determined that the behavior that led to I.B.'s suspension was due to his disability. *Id.* ¶ 32.  Cohen nevertheless refused to suspend the fifteen days of suspension that I.B. was then serving. *Id.*

I.B. continued to accumulate suspensions through the rest of his time at Harlem-2. Beginning in March 2022, and as recently as March 13, 2023, I.B. has had numerous post-suspension MDR assessments, and each time the alleged behavior was found to be a

---

[4] "The IDEA requires that an IEP be 'reasonably calculated to enable the child to receive educational benefits.'" *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)).  "Under the IDEA, '[i]f the student's behavior is not a manifestation of his disability, then the relevant discipline may be administered in the same manner applicable to a non-disabled student.  If the behavior is a manifestation of the disability, then the child's placement is not changed (absent parental consent) and the IEP team must prepare a functional behavior assessment and a behavior intervention plan." *Patrick v. Success Acad. Charter Schs., Inc.*, 354 F. Supp. 3d 185, 197 (E.D.N.Y. 2018) (quoting *Molina v. Bd. of Educ. of Los Lunas Schs.*, 157 F. Supp. 3d 1064, 1068 (D.N.M. 2015) (citations omitted)). "However, school personnel . . . may order a change in placement for a child with a disability who violates a code of student conduct." *Id.* at 198 (quoting 20 U.S.C. § 1415(k)(1)(A)).  A school may, consistent with the IDEA, remove a student to an "interim alternative educational setting" for up to forty-five school days "without regard to whether the [child's] behavior is determined to be a manifestation of the child's disability" in cases where the child has "inflicted serious bodily injury upon another person while at the school, on school premises, or at a school function."  20 U.S.C. § 1415(k)(1)(G).
[5] Plaintiffs do not plead whether the school held an MDR meeting with respect to each suspension individually or discussed several suspensions at a single MDR meeting.

manifestation of his disability. *Id.* ¶ 48. In addition, on April 8, 2022, after receiving ongoing psychiatric observation and treatment for approximately two months, I.B. was officially diagnosed with ADHD. *Id.* ¶ 33. Cohen, Alvarez, and other staff members at Harlem-2 were immediately informed of the diagnosis. *Id.* Notwithstanding the MDR determinations and I.B.'s diagnosis, Harlem-2 continued to suspend I.B., conduct that Plaintiffs allege was intended to induce Blanco to remove I.B. from the school permanently. *Id.* ¶¶ 34, 48. Harlem-2 suspended I.B. on April 21 and 22,[6] and May 5, 6, and 9, 2022, each time for five days. *Id.* ¶ 34. The suspensions were not served pending MDR assessments, which ultimately concluded that the alleged misbehavior was attributable to I.B.'s disability. *Id.* ¶¶ 34, 37. This pattern continued through May 2022, after I.B. received his IEP, which required that "he be attended to 1:1 with a para[]professional while in school." *Id.* ¶ 38. On May 19, I.B. was again suspended for five days, but on June 6, another MDR was held and ultimately determined that I.B.'s alleged misbehavior was due to his disability. *Id.* ¶¶ 41–42. On at least one occasion that same month, Harlem-2 officials cited I.B. for a uniform infraction on a day that he was absent from school. *Id.* ¶ 40.

I.B. started second grade at Harlem-2 in August 2022, with his IEP from the previous school year in place. *See id.* ¶¶ 43–44. But within days of the start of the new school year, Harlem-2 failed to comply with the terms of I.B.'s IEP. On August 18, 2022, the second day of the 2022–2023 academic year, Blanco learned that I.B. was not accompanied by a paraprofessional as required by his IEP. *Id.* ¶ 44. Over the course of that school year, the school frequently failed to provide the mandated paraprofessional. *Id.* ¶ 45. On October 18, 2022, after

---

[6] On April 22, Harlem-2 employees informed Blanco that I.B. was not welcome at the school until he was cleared by a psychiatric professional. Dkt. No. 35 ¶ 35. The following day, Blanco took I.B. to Bellevue Hospital, where he was cleared to resume his studies. *Id.*

Harlem-2 persisted in its failure to assign a paraprofessional to I.B., Blanco filed a complaint against Harlem-2 with the New York State Education Department ("NYSED"). *Id.* ¶ 52. Still, Harlem-2 continued to fail to assign a paraprofessional to I.B. *Id.* Without a dedicated paraprofessional, I.B. was accused by the school of misbehavior and subjected to suspensions and other consequences. *Id.* ¶¶ 45, 52. Over the course of the 2022–2023 school year, I.B. was suspended twenty times: in 2022 on September 6, 13, and 16, October 6 and 17, and December 6 and 7; in 2023 on January 20, 25, 27, and 30, February 7, 14, and 22, March 30, and April 11, 14, 17, 19, and 26. *Id.* ¶ 47.

Plaintiffs allege a series of actions undertaken by Defendants—in addition to frequently suspending I.B.—intended to make the school environment intolerable for I.B. and Blanco. The conduct ranges from comments by Harlem-2 administrators about the school's suitability for I.B. to physical assault. To start, administrators questioned whether I.B. should remain a student at Harlem-2. Within one week of Alvarez's comment to Blanco that I.B. was not a "good fit" at Harlem-2 in March 2022 noted above, *id.* ¶ 23, Cohen told Blanco that I.B. "isn't normal," and asked if Blanco or I.B.'s father could stay in the classroom with I.B, *id.* ¶ 28. This evaluation was echoed by I.B.'s counselor, who also told Blanco that I.B. was "not normal." *Id.* ¶ 46. On April 22, 2022, Harlem-2 employees stated that I.B. would not be welcome back to the school until he was cleared by a psychiatric professional, clearance that I.B. obtained the following day. *Id.* ¶ 35. And on May 12, 2022, Cohen allegedly poked I.B. in the eye, an incident that so upset I.B. that Blanco kept him home from school the following day. *Id.* ¶ 39. Plaintiffs further allege that, although Harlem-2 officials were aware that I.B. was being bullied by his peers, they took no action to protect I.B. from the bullying. *Id.* ¶ 51.

Each of Blanco and Harlem-2 leveled accusations against the other in the fall of 2022. As noted above, Blanco reported Harlem-2 to the NYSED for failing to comply with the terms of I.B.'s IEP.  *Id.* ¶ 52.  The school also leveled accusations against Blanco.  One week after Blanco forgot to give I.B. his medication for the first time (and rushed to the school to give it to him), Cohen suggested that the school, under the guidance of the school's own mental health professional, administer I.B.'s medication based on Blanco's single failure to administer the medication at home.  *Id.* ¶¶ 49–50.  Cohen continued to imply falsely that Blanco was not giving I.B. his medication.  *Id.* ¶ 54.  The school ultimately filed a complaint with New York City's Administration for Children's Services ("ACS") against Blanco, which Plaintiffs allege was retaliatory for Blanco's complaint with the NYSED.  *Id.* ¶¶ 55–57.  On December 16, 2022, the NYSED substantiated Blanco's complaint and issued a notice stating in part that it had determined Harlem-2 was state education law and city regulations because "the School . . . failed to provide 1:1 paraprofessional service to the Student in accordance with the Student's IEP recommendations."  *Id.* ¶ 57; Dkt. No. 35-1.[7]

Over the course of the three years that I.B. was enrolled at Harlem-2, and primarily in the last few months of I.B.'s enrollment at Harlem-2, emergency services, including Emergency Medical Services ("EMS") and the New York Police Department ("NYPD"), was called eight times based on I.B.'s alleged behavior or because he was alleged to be a danger to himself or

---

[7] The NYSED further found as follows: "the Student's IEP in effect from May 22, 2022, to present, included a recommendation for individual behavioral paraprofessional services which were to be provided to the Student daily, in school and fulltime[,] and the services of a transportation paraprofessional.  However, between August 17, 2022, and November 29, 2022, the individual services of the behavior paraprofessional were not provided on 11 days.  The services were not provided during the Student's lunch and recess hours.  As of December 16, 2022, the service of the transportation paraprofessional has not been initiated."  Dkt. No. 35-1 at 5.

others.[8]  Dkt. No. 35 ¶¶ 65–66.  On April 25, 2022, after an unidentified employee of Harlem-2 notified Blanco that I.B. was exhibiting behavioral problems, Blanco arrived at the school to find I.B. surrounded by police officers and emergency medical personnel, unable to move freely.  *Id.* ¶ 36.  Blanco immediately took I.B. to a nearby hospital for observation, where psychiatric professionals concluded that there was no need for police and emergency medical intervention and no need for hospitalization.  *Id.*  The school continued to summon emergency services on the basis of I.B.'s conduct the following academic year.  On January 6, 2023, Cohen caused emergency services to again be called on I.B., which caused I.B. to again be surrounded by police officers and EMS.  *Id.* ¶ 58.  On February 17, 2023, one day after another MDR hearing that concluded that I.B.'s behavior giving rise to a suspension was due to his disability, Blanco was informed by Cohen that 911 was called due to I.B.'s behavior and that officers and EMS responded to the scene.  *Id.* ¶ 59.  Although Blanco informed Cohen that she was on her way to the school, I.B. was taken to Harlem Hospital against his will and without his parents.  *Id.* ¶ 60. I.B. was cleared within hours and released.  *Id.*  On four other occasions between February and April 2023, Harlem-2 staff called 911 on I.B.  *See id.* ¶¶ 61–64.  On three occasions, he was released into the custody of his father or Blanco.  *Id.* ¶¶ 61–63.  On the fourth occasion, he was taken to the hospital without advance notice to Blanco, where he was cleared and discharged.  *Id.* ¶ 64.  In each instance that Harlem-2 employees caused I.B. to go to the hospital because he was alleged to be a danger to himself or others, hospital medical professionals found that he posed no such risk and discharged him.  *Id.* ¶ 66.

On April 27, 2023, counsel for Success Academy filed a request with the NYSED and the New York City Office of Administrative Trials and Hearings to remove I.B. from Harlem-2.  *Id.*

---

[8] Plaintiffs make allegations as to only some of the eight instances.  *See* Dkt. No. 35 ¶¶ 58–64.

¶ 68.  In May 2023, Blanco removed I.B. from Harlem-2 and the broader Success Academy

network of schools.  *Id.* ¶ 69.

## PROCEDURAL HISTORY

Plaintiffs initiated this action on February 27, 2023.  *See* Dkt. No. 1.  On May 19, 2023,

Defendants filed a motion to dismiss.  Dkt. No. 29.  In response, on June 14, 2023, Plaintiffs

filed their FAC, Dkt. No. 35, and the Court then dismissed the motion to dismiss as moot, Dkt.

No. 39.  The FAC asserts the following six claims: (1) discrimination against I.B. in violation of

§ 504 of the Rehabilitation Act against Success Academy and Harlem-2 (first cause of action),

Dkt. No. 35 ¶¶ 71–78; (2) false imprisonment against Cohen and Alvarez under 42 U.S.C. §

1983 and New York state law (second cause of action), *id.* ¶¶ 79–84; (3) intentional infliction of

emotional distress against all Defendants (third cause of action), *id.* ¶¶ 85–89; (4) abuse of

process against unspecified defendants under 42 U.S.C. § 1983 and state law (fourth cause of

action), *id.* ¶¶ 90–98; (5) municipal and supervisory liability under 42 U.S.C. § 1983 against

Success Academy and Moskowitz (fifth cause of action), *id.* ¶¶ 99–116;[9] and (6) *respondeat*

*superior* against unspecified defendants (sixth cause of action), *id.* ¶¶ 117–119.

On June 23, 2023, Defendants filed this motion to dismiss, along with a memorandum of

law in support of the motion.  Dkt. Nos. 41–42.  Defendants move to dismiss the second through

sixth causes of action, and all claims against the individual defendants,[10] for failure to state

---

[9] Plaintiffs reference the "Success Network" and the "Board of Trustees" in a parenthetical to
their fifth cause of action.  Dkt. No. 35 at 15.  Plaintiffs appear to use "Success Network"
interchangeably with Defendant Success Academy at various points throughout the FAC.  *See,
e.g.*, Dkt. No. 35 ¶ 1 (referring to Success Academy charter schools as "Success Network").  To
the extent that Plaintiffs intend, by referencing the Success Network, to name a defendant other
than Success Academy, they have failed to do so.  Nor, as previously discussed, have they named
or served the Board of Trustees.  The Court thus construes the fifth cause of action to be pleaded
against only Success Academy and Moskowitz.  *See* Fed. R. Civ. P. 10(a) ("[T]he title of the
complaint must name all the parties.").
[10] Plaintiffs allege their first cause of action—discrimination in violation of § 504 of the

claims for relief pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 42 at 1–2. In addition, Defendants contend that all claims should be dismissed against Alvarez for the failure to make sufficient service of process under Rule 12(b)(5). *Id.* at 2.

Plaintiffs filed a memorandum of law in opposition to the motion to dismiss and a declaration of counsel in opposition to the motion to dismiss on July 12, 2023. Dkt. Nos. 43–44. On July 24, 2023, Defendants filed a reply memorandum of law in further support of their motion to dismiss. Dkt. No. 48.

## DISCUSSION

Defendants move to dismiss all but Plaintiffs' first cause of action for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 41. Defendants also move to dismiss the FAC against Alvarez for failure to serve process under Rule 12(b)(5). *Id.* Because "the adequacy of service of process must be resolved before any merits-based challenge to the complaint," *Deptula v. Rosen*, 558 F. Supp. 3d 73, 83 (S.D.N.Y. 2021), the Court begins with the 12(b)(5) challenge.

## I. Dismissal of Claims Against Alvarez for Failure to Properly Effect Service

Plaintiffs do not dispute that they failed to serve Alvarez with process, but state that they tried to serve Alvarez but were told that he no longer worked at Harlem-2 and were not given any further information. Dkt. No. 44 at 2. Plaintiffs ask that Defendants be ordered to provide contact information for Alvarez and that they be permitted to serve Alvarez *nunc pro tunc*. *Id.*

### A. Good Cause

As the Federal Rules of Civil Procedure make clear, "[t]he plaintiff is responsible for having the summons and complaint served within the time allowed by Rule 4(m)." Fed. R. Civ.

---

Rehabilitation Act—only against Success Academy and Harlem-2, without including any individual defendants. Accordingly, the Court addresses only Counts Two through Six.

P. 4(c)(1).  Under Rule 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against the defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m).  "An exception to this rule exists if a plaintiff is able to demonstrate good cause for failure to timely serve." *Cassano v. Altshuler*, 186 F. Supp. 3d 318, 321 (S.D.N.Y. 2016).  Plaintiffs "bear the burden of proof in showing that [they] had good cause in not timely serving the defendant." *George v. Pro. Disposables Int'l Inc.*, 221 F. Supp. 3d 428, 433 (S.D.N.Y. 2016); *see also Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010) (summary order).

"Good cause is measured against the plaintiff's reasonable efforts to effect service and the prejudice to the defendant from the delay, and the court should look to whether the plaintiff was diligent in making reasonable efforts to effect service." *Gong v. Sarnoff*, 2023 WL 8096970, at *2 (S.D.N.Y. Nov. 21, 2023) (quoting *George*, 221 F. Supp. 3d at 432–33).  "Good cause . . . is evidenced only in exceptional circumstances, where the insufficiency of service results from circumstances beyond the plaintiff's control." *Feingold v. Hankin*, 269 F. Supp. 2d 268, 276 (S.D.N.Y. 2003).  "A delay in service resulting from the mere inadvertence, neglect, or mistake of a litigant's attorney does not constitute good cause." *AIG Managed Mkt. Neutral Fund v. Askin Cap. Mgmt., L.P.*, 197 F.R.D. 104, 108 (S.D.N.Y. 2000).

Plaintiffs have not shown good cause for their delay in serving Alvarez.  The original complaint in this action was filed on February 27, 2023.  *See* Dkt. No. 1.  Defendants first moved to dismiss the claims against Alvarez for failure to make service of process on May 19, 2023. Dkt. No. 30 at 7–8.  Plaintiffs did not then move for an extension of time to serve Alvarez.  In fact, the first time that Plaintiffs sought any form of an extension was on July 12, 2023, Dkt. No. 44, after they filed their FAC and after Defendants filed their motion to dismiss the FAC.

Plaintiffs' failure to ask for an extension when they were first put on notice of the insufficient service "weighs against" a finding of good cause. *See Cassano*, 186 F. Supp. 3d at 322; *see also Fantozzi v. City of New York*, 343 F.R.D. 19, 30 (S.D.N.Y. 2022); *Spinale v. United States*, 2005 WL 659150, at *4 (S.D.N.Y. Mar. 16, 2005). Plaintiffs' minimal efforts to serve Alvarez were desultory and bespeak a lack of interest in him. *See, e.g.*, *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654, 658 (S.D.N.Y. 1997), *aff'd*, 173 F.3d 844 (2d Cir. 1999) (failure to obtain defendant's address does not constitute good cause).

Plaintiffs "offer no explanation for their failure to effect proper service." *Cassano*, 186 F. Supp. 3d at 322. Plaintiffs aver that they attempted service on Alvarez at Harlem-2 but, when told that Alvarez no longer worked at Harlem-2, did nothing further to ascertain Alvarez's whereabouts. Dkt. No. 44 at 2. That Defendants provided no information as to Alvarez's current home address or employer is not adequate justification for Plaintiffs' failure to serve. *See, e.g.*, *Junior-Donohue v. Fudge*, 2023 WL 5152299, at *2 (S.D.N.Y. Aug. 10, 2023) ("[W]hile opposing counsel's refusal to provide an address for service may or may not represent questionable litigation practice, ultimately, it is 'the responsibility of [a plaintiff's] attorney—and not the Court or Defendants—to ensure that all Defendants were properly served.'" (quoting *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 420 (S.D.N.Y. 2013))). Plaintiffs have thus "failed to explain why these circumstances precluded service from occurring during the allotted [ninety]-day period." *Gibbs v. Imagimed, LLC*, 2013 WL 2372265, at *2 (S.D.N.Y. May 30, 2013). And Plaintiffs do not describe any other efforts undertaken to discover Alvarez's current employment or address. *See, e.g.*, *Ortiz v. 5 Star Valet LLC*, 2022 WL 17418368, at *2 (S.D.N.Y. Dec. 2, 2022). Nor have Plaintiffs described "any exceptional circumstances preventing [them] from timely serving" Alvarez. *Clarke v. Sec. King Int'l LLC*, 2022 WL

5107195, at *1 (S.D.N.Y. Oct. 4, 2022).  Plaintiffs received notice that their claims against

Alvarez in their original complaint were at risk of dismissal for failure to serve process from

Defendants' first motion to dismiss, and yet still, they did not promptly act to correct the

deficiency.  In such circumstances, courts have generally found no good cause.  *See, e.g.*,

*Cassano*, 186 F. Supp. 3d at 322; *Vaher*, 916 F. Supp. 2d at 421 ("Defendants . . . have

repeatedly raised the service deficiencies since the very outset of this litigation and Plaintiff still

has not attempted reasonable efforts to cure them."); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,

222 F.R.D. 79, 81 (S.D.N.Y. 2004) (denying motion for extension of time for service where the

plaintiff was twice notified of the lack of proper service and failed to correct it); *Allianz Ins. Co.

v. Otero*, 2003 WL 262335, at *4 (S.D.N.Y. Jan. 30, 2003) (dismissing case where the plaintiff

never requested an extension of time within the original window for service).[11]

### B.    Discretionary Authority Absent Good Cause

In the absence of good cause, the Court nevertheless retains "the discretion to grant an

extension of time to serve the defendant."  *Hahn v. Off. & Pro. Emps. Int'l Union*, 107 F. Supp.

3d 379, 382 (S.D.N.Y. 2015).  "[A] district court may extend the time to serve if, after balancing

the relative prejudice to the parties and considering all relevant factors, it concludes that such an

extension is justified."  *Mares v. United States*, 627 F. App'x 21, 23 (2d Cir. 2015) (summary

order) (citing *Zapata v. City of New York*, 502 F.3d 192, 198–99 (2d Cir. 2007), *cert. denied*, 552

U.S. 1243 (2008)).  In determining whether a discretionary extension is appropriate in the

absence of good cause, courts in this Circuit generally consider four factors: "(1) whether any

applicable statutes of limitations would bar the action once re-filed; (2) whether the defendant[s]

---

[11] "[W]hile '[d]istrict courts have a responsibility to assist *pro se* plaintiffs in their efforts to
serve process on defendants,' they have no special responsibility to assist represented plaintiffs
in such efforts."  *Labombard v. City of New York*, 2023 WL 3841858, at *1 (S.D.N.Y. June 6,
2023) (quoting *Murray v. Pataki*, 378 F. App'x 50, 52 (2d Cir. 2010) (summary order)).

had actual notice of the claims asserted in the complaint; (3) whether defendant[s] attempted to conceal the defect in service; and (4) whether defendant[s] would be prejudiced by extending plaintiff's time for service." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 66 (S.D.N.Y. 2010).  "It is also appropriate to consider judicial efficiency in determining whether late service should be permitted." *Esposito v. City of New York*, 2014 WL 12776119, at *2 (E.D.N.Y. Apr. 1, 2014).  Balancing these factors, the Court finds that here, exercising its discretion to enter an extension for Plaintiffs to serve Alvarez is justified.

The first factor—whether the claims will be time-barred if an extension is not granted and Plaintiffs must refile—while not dispositive, *see Harmon v. Bogart*, 788 F. App'x 808, 820 (2d Cir. 2019) (summary order), to some extent cuts in favor of Defendants, as the claims raised here will not have expired if the Plaintiffs are forced to refile.  At the same time, however, "courts weighing this consideration have focused on whether the plaintiff had been aware of the deadline and the extent of the plaintiff's efforts to meet it." *Kogan v. Facebook, Inc.*, 334 F.R.D. 393, 404 (S.D.N.Y. 2020).  Here, although Plaintiffs were made aware of the deadline to effect service of process by Defendants' initial motion to dismiss, *see* Dkt. No. 29, they did take at least some minimal steps to meet the deadline by attempting to serve Alvarez at the place they believed Alvarez was employed, Harlem-2, Dkt. No. 44 at 2.  And Harlem-2 did not provide any information regarding Alvarez's home address or current employer. *Id.*

Courts next consider whether the unserved defendant had actual notice of the claims asserted in the complaint. *See, e.g.*, *DeLuca*, 695 F. Supp. 2d at 66.  Here, "[w]hile there is no competent evidence to support a conclusion that . . . the unserved Defendant[] had actual notice of the claims against [him], defense counsel filed a Notice of Appearance on behalf of all Defendants and has engaged in motion practice on their behalf." *Vaher*, 916 F. Supp. 2d at 421.

Accordingly, and mindful of the longstanding "preference that litigation disputes be resolved on the merits," *Cody v. Mello*, 59 F.3d 13, 15 (2d Cir. 1995), the Court will "assume that the second factor favors plaintiff[s]," *Vaher*, 916 F. Supp. 2d at 421.

The third factor, however, cuts against Plaintiffs, as Defendants highlighted the lack of service on Alvarez in their first motion to dismiss, Dkt. No. 29, and Plaintiffs nevertheless did not address it in a timely fashion, *see, e.g.*, *Vaher*, 916 F. Supp. 2d at 419–20; *see also Etheredge-Brown v. Am. Media, Inc.*, 2015 WL 4877298, at *4 (S.D.N.Y. Aug. 14, 2015). "[N]otification to the plaintiff by the defendant . . . of a defect in the service of process is sufficient to start the clock on the reasonable amount of time afforded to the plaintiff to cure the defect." *Kurzberg v. Ashcroft*, 619 F.3d 176, 185 (2d Cir. 2010). However, this factor is not dispositive, *see Harrison v. New York*, 95 F. Supp. 3d 293, 320 (E.D.N.Y. 2015) (Bianco, J.); *Feingold*, 269 F. Supp. 2d at 277, and "does not offset the numerous reasons that support granting plaintiff's attempted service," *Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 699 (E.D.N.Y. 2013).

Finally, the fourth factor—whether the unserved defendants would be prejudiced by an extension—cuts in favor of granting an extension to Plaintiffs to effect proper service. Courts in this Circuit have found such prejudice where service would be made at a later stage of litigation, such as when discovery has completed. *See, e.g.*, *George*, 221 F. Supp. 3d at 437. But here, at this early stage of the litigation, the Court does not find discernable prejudice to Alvarez. The motion to dismiss has been fully briefed on behalf of all defendants, including Alvarez. The Court, on motion by the Defendants, stayed discovery pending a decision on the motion to dismiss in August 2023, Dkt. No. 51, such that there is no discernable risk that relevant evidence be excluded. And settlement discussions before Magistrate Judge Parker were also stayed

pending resolution of the motion to dismiss.  Dkt. No. 53.  Moreover, judicial efficiency and the express goals of the Federal Rules of Civil Procedure of achieving "just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1, would be disserved by requiring Plaintiff to file a new action naming Alvarez, only to have that action assigned to the undersigned, *see, e.g.*, *Esposito*, 2014 WL 12776119, at *4 ("It is more efficient for the Court to consider all of Plaintiff's claims in the present action with which it is familiar rather than having Plaintiff file a different case in which discovery would need to be coordinated with discovery in this case.").  And the amount of time that has lapsed between the expiration of ninety deadline for service and the stay of discovery was less than three months.  *See, e.g.*, *John v. City of Bridgeport*, 309 F.R.D. 149, 156 (D. Conn. 2015) (finding any prejudice accruing from forty-nine-day delay in service to be negligible).

On balance, the factors relevant to the Court's determination whether to excuse a party's untimely service weigh in Plaintiffs' favor.  Accordingly, the Court exercises its discretion to grant Plaintiffs an extension of time to serve Alvarez.

## II.     Dismissal of Claims Against All Defendants for Failure to State a Claim

Defendants further move to dismiss all of the claims in the FAC except for the first—the claim of discrimination in violation of the Rehabilitation Act—for failure to state a claim.  *See* Dkt. No. 42 at 8–23.

In considering a motion to dismiss pursuant to Rule 12(b)(6), a "court must accept the material facts as alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (per curiam) (quoting *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994)).  However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility," in other words, whether "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

   With these rules in mind, the Court considers each of the challenged causes of action and Defendants' arguments in turn.

### A.    False Arrest and False Imprisonment Claim

   In their second cause of action, Plaintiffs assert that Cohen and Alvarez are liable for false arrest and imprisonment under both 42 U.S.C. § 1983[12] and state law.  Dkt. No. 35 ¶¶ 79–84.  As noted, Plaintiffs allege that EMS workers and NYPD officers were contacted numerous times by Harlem-2 employees based on I.B.'s alleged behavior, and that on at least two

---

[12] Section 1983 "provides a mechanism for enforcing individual rights 'secured' elsewhere, *i.e.*, rights independently 'secured by the Constitution and laws' of the United States." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).  It was enacted "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).  Accordingly, "[t]o state a claim under § 1983, a plaintiff must allege two elements: (1) 'the violation of a right secured by the Constitution and laws of the United States,' and (2) 'the alleged deprivation was committed by a person acting under color of state law.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87–88 (2d Cir. 2015) (quoting *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004)).

occasions, he was removed to a hospital against his will.  *Id.* ¶¶ 60, 64.  Plaintiffs allege that Cohen and Alvarez "caused I.B. to be confined against his will and without his consent."  *Id.* ¶ 80.

Defendants contend that Plaintiffs have failed to state a claim for false imprisonment or false arrest.  As to Alvarez, Defendants argue that the FAC does not allege any facts that Alvarez called 911 or in any way caused I.B. to be confined.  Dkt. No. 42 at 8.  As to Cohen, Defendants argue that Cohen's alleged acts in directing first responders to I.B. cannot give rise to liability for false imprisonment because she merely furnished information to law enforcement and the responding officers had the freedom to exercise their own judgment whether an arrest should be made; that I.B. was not confined; and that any seizure was reasonable.  *Id.* at 8–11.  Defendants also argue that both Alvarez and Cohen enjoy qualified immunity against Plaintiffs' claims.  *Id.* at 12.

"False arrest and false imprisonment . . . are two names for the same tort."  *Holland v. City of Poughkeepsie*, 935 N.Y.S.2d 583, 589 (2d Dep't 2011); *see also Jenkins v. City of New York*, 478 F.3d 76, 88 n.10 (2d Cir. 2007) ("False arrest and false imprisonment are largely synonymous because an imprisonment starts at the moment of arrest.").  A "§ 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause."  *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (Sotomayor, J.).

"In analyzing § 1983 claims for unconstitutional false arrest, [courts] have generally looked to the law of the state in which the arrest occurred."  *Id.* (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)).  "A § 1983 claim for false arrest . . . is substantially the same as a claim for false arrest under New York law."  *Ackerson v. City of White Plains*, 702 F.3d 15, 19

(2d Cir. 2012) (per curiam) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  "Under New York law, the elements of a false arrest and false imprisonment claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'"  *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016) (per curiam)); *Wieder v. Home Depot U.S.A., Inc.*, 172 N.Y.S.3d 474, 478 (2d Dep't 2022).  In order "[t]o establish a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must show that 'the defendant intentionally confined him without his consent and without justification.'"  *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Weyant*, 101 F.3d at 852).  "A false imprisonment claim requires a prima facie showing of actual confinement or threatening conduct."  *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 294 (S.D.N.Y. 2011) (quoting *Lee v. Bankers Tr. Co.*, 1998 WL 107119, at *4 (S.D.N.Y. Mar. 11, 1998), *aff'd*, 166 F.3d 540 (2d Cir. 1999)).

"To 'establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show the . . . defendant's personal involvement in the alleged constitutional deprivation.'"  *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)); *see Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020); *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010).  A third party can be liable for the confinement effected by another if she "affirmatively procured or instigated the plaintiff's arrest."  *King v. Crossland Sav. Bank*, 111 F.3d 251, 256 (2d Cir. 1997) (citing *Carrington v. City of New York*, 607 N.Y.S.2d 721, 722 (2d Dep't 1994)); *see Biswas v. City of New York*, 973 F. Supp. 2d 504, 519 (S.D.N.Y. 2013), *aff'd sub nom.*, *Biswas v. Kwait*, 576 F. App'x 58 (2d Cir. 2014) (summary order) (applying proposition to school principal and teacher).  A third party is

not held liable for false arrest by merely "seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made." *Savarese v. City of New York*, 547 F. Supp. 3d 305, 340–41 (S.D.N.Y. 2021) (quoting *Delince v. City of New York*, 2011 WL 666347, at *4 (S.D.N.Y. Feb. 7, 2011)). "The defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition." *Mesiti v. Wegman*, 763 N.Y.S.2d 67, 69 (2d Dep't 2003) (quoting 59 N.Y. Jur. 2d, False Imprisonment and Malicious Prosecution § 37); *see Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 412 (S.D.N.Y. 2015), *aff'd sub nom.*, *Abdel-Karim v. Egyptair Holding Co.*, 649 F. App'x 5 (2d Cir. 2016) (summary order); *Kraft v. City of New York*, 696 F. Supp. 2d 403, 421 (S.D.N.Y. 2010) (Chin, J.), *aff'd*, 441 F. App'x 24 (2d Cir. 2011) (summary order).  A plaintiff must allege that the defendant "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010); *see also Du Chateau v. Metro-North Commuter R. Co.*, 688 N.Y.S.2d 12 (1st Dep't 1999); *see Sanders v. City of Saratoga*, 2023 WL 5563386, at *8 (N.D.N.Y. Aug. 29, 2023) (holding that private defendants instigated arrest where they insisted on arrest even after having been informed that the police did not view the matter as criminal); *TADCO Const. Corp. v. Dormitory Auth. of State of N.Y.*, 700 F. Supp. 2d 253, 269 (E.D.N.Y. 2010) (holding that defendants instigated arrest when rather than go through appropriate channels to settle their contract dispute, they called the police and demanded Plaintiff's arrest).  "Examples of affirmative inducement include 'taking an active part in the arrest and procuring it to be made' and 'showing active, officious and undue zeal to the point where the officer is not acting of his own volition.'" *Palmer v. City of New York*, 564 F.

Supp. 3d 221, 244 (E.D.N.Y. 2021) (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 13–14 (2d Cir. 1998)); *see Rice v. City of New York*, 275 F. Supp. 3d 395, 409 (E.D.N.Y. 2017) (same); *see also Savarese*, 547 F. Supp. 3d at 342.

"New York law holds that a 'defendant' can be said to have 'instigated' the arrest of a plaintiff if [s]he does so 'with knowledge that there is no lawful basis therefor,'" *Powell v. Scollard*, 2023 WL 5975249, at *4 (S.D.N.Y. Sept. 14, 2023) (quoting *Warner v. Druckier*, 697 N.Y.S.2d 610, 611 (1st Dep't 1999)); *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 721 (S.D.N.Y. 2012), *appeal dismissed*, 509 F. App'x 43 (2d Cir. 2013) (summary order), or if the defendant "'intentionally provided false information' to instigate an arrest by law-enforcement officials," *Biswas*, 973 F. Supp. 2d at 519 (quoting *Brown v. Nassau County,* 760 N.Y.S.2d 655, 655–56 (2d Dep't 2003)); *see also Rodriguez v. Sky, 605 W 42 St Owner LLC*, 2023 WL 7305147, at *4 (S.D.N.Y. Nov. 6, 2023) (same).  At the same time, however, "where a civilian complainant 'had a reasonable basis' for the belief that a person was committing a crime, this basis suffices to defeat a false arrest claim, 'even if a civilian complainant is ultimately incorrect in his belief as to whether a person is committing a crime.'"  *Rodriguez*, 2023 WL 7305147, at *4 (quoting *TADCO Const. Corp.*, 700 F. Supp. 2d at 275); *see Pacicca v. Stead*, 496 F. App'x 9, 12 (2d Cir. 2011) (summary order); *Biswas*, 973 F. Supp. 2d at 519; *see also Delince*, 2011 WL 666347, at *4 ("Even in an instance where a defendant allegedly provides incorrect or incomplete information to law enforcement, a successful false arrest claim requires allegations that the private defendant affirmatively induced or importuned the officer to arrest." (internal quotation marks omitted)).

The FAC alleges a large number of instances in which EMS or the police were called to investigate an alleged incident involving I.B.  *See* Dkt. No. 35 ¶ 65 (emergency services called

eight times on I.B.).  However, the FAC contains no allegations that Alvarez was involved in any

of the incidents involving either EMS or the police.  Indeed, the only allegations against Alvarez

are (1) that he was Assistant Principal at Harlem-2, *id.* ¶ 11; (2) that on March 1 and 2 of 2022—

before the first of the alleged arrests on April 25, 2022, *see id.* ¶ 36—he discussed with Blanco

the process of obtaining an IEP for I.B. and told Blanco that I.B. was not a "good fit" for

Harlem-2, *id.* ¶¶ 20, 23–24; and (3) that later in March 2022, when Blanco picked I.B. up from

school and asked Alvarez how I.B.'s day went, "Alvarez told her he was not allowed legally to

speak to her," *id.* ¶ 30.  In short, the FAC nowhere alleges that Alvarez had anything to do with

the incidents involving emergency services.  That Alvarez was Assistant Principal of Harlem-2

does not alone make him legally responsible under § 1983 or New York false imprisonment law

for the conduct of others at the school.  *See, e.g.*, *K.D. ex rel. Duncan v. White Plains Sch. Dist.*,

921 F. Supp. 2d 197, 206–07 (S.D.N.Y. 2013).  Moreover, all of the incidents involving Alvarez

date back to March 2022, *see* Dkt. No. 35 ¶¶ 20, 22–24, 30, and are unrelated to the alleged

arrests that began later.  Because a defendant's personal involvement in the alleged constitutional

deprivation is a prerequisite to a successful § 1983 claim, *see, e.g.*, *Farid*, 593 F.3d at 249,

Plaintiffs have failed to state a claim for false arrest and false imprisonment against Alvarez.

The FAC also does not allege sufficient facts to plausibly establish that, on the single

occasion that Cohen contacted emergency services, I.B. was confined, although Plaintiffs may be

able to cure that defect in an amended pleading.  A person is "seized" for Fourth Amendment

purposes when his liberty is restrained "by means of physical force or show of authority."

*Salmon v. Blesser*, 802 F.3d 249, 252 (2d Cir. 2015) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16

(1968)).  "To explain when a sufficient 'show of authority' effects restraint, the Supreme Court

has relied on a totality-of-the-circumstances test, asking whether a reasonable person would

believe that he was 'not free to leave.'" *Id.* (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984)). The following factors, among others, form some of the circumstances that could lead a reasonable person to believe she was not free to move freely: "threatening presence of several officers; the display of a weapon; physical touching of the person [by] the officer; language or tone indicating that compliance with [the] officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by an officer to accompany him to the police station or a police room."[13] *Dejesus v. Village of Pelham Manor*, 282 F. Supp. 2d 162, 169 (S.D.N.Y. 2003) (quoting *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990)); *see Estate of M.D. v. New York*, 241 F. Supp. 3d 413, 423–24 (S.D.N.Y. 2017); *Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005). These factors are not all necessary nor they exclusive. *Hunt*, 410 F.3d at 1226 (holding that the presence of "two or three factors" may demonstrate that the plaintiff was not free to leave). Courts apply the same standards when considering whether the plaintiff has been "confined" for purposes of the New York tort of false arrest or false imprisonment. *Biswas*, 973 F. Supp. 2d at 515. Likewise, under New York law, "[w]henever a person unlawfully obstructs or deprives another of his freedom to choose his own location, that person will be liable for that interference." *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975). Detention for "any length of time" may constitute an arrest. *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991). And "[t]here is no requirement under New York law that an arrest be in any sense formal." *Id.*; *see Calderon v. City of New York*, 138 F. Supp. 3d 593, 610 (S.D.N.Y. 2015) ("Under both federal and New York law, a plaintiff need not have been

---

[13] Although most of the case law speaks to restraint by a police officer, a defendant need not be a police officer to face liability under either the Fourth Amendment or New York false imprisonment law. *See, e.g.*, *New Jersey v. T.L.O.*, 469 U.S. 325 (1985); *Sindle v. N.Y.C. Transit Auth.*, 307 N.E.2d 245 (N.Y. 1973).

formally arrested to claim false arrest."); *see also Jacks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003).[14]

The age of the plaintiff is also relevant.  Conduct that would not lead a reasonable person of mature years to believe she was not free to leave might still reasonably instill that view in a person who has not yet reached the age of maturity.  *Estate of M.D.*, 241 F. Supp. 3d at 423–24; *see Phillips v. County of Orange*, 894 F. Supp. 2d 345, 363 (S.D.N.Y. 2012) (finding that "a reasonable five-year-old child would not have thought she was free to leave or decline the adults' questioning"); *Guan N.*, 2014 WL 1275487, at *6; *United States v. Little*, 18 F.3d 1499, 1505 n.6 (10th Cir. 1994); *United States v. Knights*, 989 F.3d 1281, 1288 (11th Cir.), *cert. denied*, 142 S. Ct. 709 (2021); *see also Hunt*, 410 F.3d at 1226 (noting that the plaintiff's "encounter" with police officers should be viewed "through the eyes of a reasonable sixteen-year-old"); *Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003) (asking whether a "reasonable child" being questioned at school about abuse allegations would have felt free to leave); Restatement of Torts § 283A ("A child is a person of such immature years as to be incapable of exercising the judgment, intelligence, knowledge, experience, and prudence demanded by the standard of the reasonable man applicable to adults.").  For example, a five-year-old child who is "taken by a government official from her school to a hospital where she [i]s required to remain for several hours before being examined and returned to her parents" is seized within the meaning of the Fourth

---

[14] Because police officers were allegedly involved in the encounter, the Court need not consider now whether a higher standard should be applied in some school settings "that asks not whether a reasonable person would feel restrained in the plaintiff's situation—because *all* schoolchildren are (lawfully) restrained in some sense—but rather whether 'the limitation on the student's freedom of movement . . . significantly exceed[s] that inherent in every-day, compulsory attendance.'"  *Guan N. v. N.Y.C. Dep't of Educ.*, 2014 WL 1275487, at *19 (S.D.N.Y. Mar. 24, 2014) (Nathan, J.) (quoting *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1251 (10th Cir. 2008)); *see also J.L. v. E. Suffolk Boces*, 2018 WL 1882847, at *10 (E.D.N.Y. Apr. 19, 2018).

Amendment. *Tenenbaum v. Williams*, 193 F.3d 581, 602 (2d Cir. 1999), *cert. denied*, 529 U.S. 1098 (2000); *see E.D. ex rel. V.D. v. Tuffarelli*, 692 F. Supp. 2d 347, 366 (S.D.N.Y. 2010), *aff'd sub nom.*, *E.D. ex rel. Demtchenko v. Tuffarelli*, 408 F. App'x 448 (2d Cir. 2011) (summary order) ("The removal of a child, even on a temporary basis, may constitute a 'seizure' for the purpose of the Fourth Amendment's prohibition against unlawful search and seizure." (citing *Tenenbaum*, 193 F.3d at 602)).  In the school context, the counterpart to a request to an adult enter an interrogation room at a police station might be a request by law enforcement to a child to go to the principal's office or to a separate room, away from classmates.  A five-year-old child who is taken by a school administrator to a separate room where she is questioned by three adults with the door closed also is "seized" within the meaning of the Fourth Amendment.  *Phillips*, 894 F. Supp. 2d at 363; *see also Heck*, 327 F.3d at 510 (finding that an eleven-year-old child who was "escorted from class" by school officials and a uniformed police officer into a separate room where he was subject to questioning was "seized"); *Guan N.*, 2014 WL 1275487, at *20 (finding that children were detained when they were pulled from classroom and questioned individually for twenty minutes each).

25

The FAC alleges that, "[o]n January 6, 2023, Defendant Cohen caused 911 to be called on I.B. again and caused I.B. to be surrounded by NYPD officers and EMS."  Dkt. No. 35 ¶ 58.[15] The allegation is more specific than those made with respect to I.B.'s other encounters with emergency personnel where Plaintiffs merely state that "members of NYPD, FDNY and EMS were there."  *Id.* ¶ 62.  At the same time, however, the FAC includes an allegation in which an unnamed "employee of Harlem-2" called emergency personnel, causing I.B., "surrounded by police officers and [emergency medical technicians]," to be "trapped and unable to move about," but Cohen is not alleged to have been involved in that incident.  *Id.* ¶ 36.  And Cohen is not alleged to have called or directed another staff member to call EMS on the occasion that emergency responders took I.B. to the hospital against his will.  *See id.* ¶¶ 59–60 (stating only that "Blanco was informed by Defendant Cohen that 911 was called due to I.B.'s behavior").

It is axiomatic that "[n]ot every encounter between a state official and a private citizen is a seizure."  *See, e.g.*, *Dejesus*, 282 F. Supp. 2d at 168.  For example, "questions are neither searches nor seizures."  *United States v. Childs,* 277 F.3d 947, 949 (7th Cir.) (en banc), *cert.*

---

[15] The other instances in which the FAC alleges that I.B. had the police called on him do not identify an individual actor responsible for calling the police.  *See, e.g.*, Dkt. No. 35 ¶ 59 ("Blanco was informed by Defendant Cohen that 911 was called due to I.B.'s behavior."); *id.* ¶ 61 ("On February 22[,] Harlem-2 staff again called 911 to have the police and EMS come to pick up I.B."); *id.* ¶ 62 ("On April 3, 2023, Harlem-2 staff again called 911 to have the police and EMS come to pick up I.B."); *id.* ¶ 63 ("On April 13, Harlem-2 staff again called 911 on I.B.").  Because a plaintiff asserting false arrest or imprisonment must "name as defendants the individuals who were directly and personally involved in the constitutional deprivation" or at least state claims against unknown defendants as John or Jane Does, and Plaintiffs only list "John Doe ##1-4" in the caption of the FAC without making any allegations regarding the unnamed parties, they fail to state a claim as a matter of law.  *See, e.g.*, *Raysor v. City of New York*, 2021 WL 230296, at *4 (E.D.N.Y. Jan. 21, 2021) (dismissing claims against unknown defendants where the plaintiff had "not connected any of her factual allegations to any unidentified individual Defendant"); *see also McDaniel v. New York*, 2019 WL 3080907, at *2 (S.D.N.Y. July 12, 2019) (citing *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013)).

*denied*, 537 U.S. 829 (2002).  The FAC lacks allegations of fact that would turn the routine calling of emergency personnel into a seizure or a confinement.  There is no allegation as to the number of the emergency personnel, how many of the emergency personnel were medical staff and how many were police officers, the distance of the individuals from I.B., the size of the room in which I.B. was located and where the officers were located in said room, or whether the individuals seized any of I.B.'s personal effects, such as his backpack.  Nor is there any allegation as to whether the officers were in uniform or otherwise recognizable as law enforcement.  There is no allegation as to whether and how the emergency medical personnel and officers identified themselves.  Nor do Plaintiffs allege that the officers questioned I.B. or gave him any instructions or orders.  There is no allegation that any of the emergency personnel asked I.B. to move or that they moved him on the occasion that the FAC alleges that Cohen "caused 911 to be called."  *See* Dkt. No. 35 ¶ 58.  Nor does the FAC contain allegations regarding the emergency responders' tone of voice.  In sum, there is no allegation of any conduct taken by EMS or NYPD personnel that suggests that I.B. reasonably felt that he was not free to leave or to move.  Plaintiffs need not allege facts supporting each and every criterion that courts have identified for a seizure.  They need not allege that I.B. was moved if, for example, he was surrounded by police officers in a fashion that a reasonable person of his age would understand he was not free to leave their presence.  Nor need Plaintiffs allege that the personnel identified themselves as police if, in fact, I.B. was moved.  But, in the absence of the allegation of any supporting facts, the FAC as currently pleaded fails to state a claim of a Fourth Amendment seizure or a state law confinement.  *See, e.g.*, *Estate of M.D.*, 241 F. Supp. 3d at 424 (dismissing false arrest claim for failure to make anything other than conclusory allegations of seizure).

If I.B. was in fact arrested or confined, however, the FAC does contain sufficient allegations that Cohen instigated such confinement by making a false report.  The FAC alleges, "[u]pon information and belief, Defendant Cohen either caused the false imprisonment by directing first responders to I.B. and falsely claiming he was a danger of serious physical injury or death to himself or others, or was advised in each case before arrival of first responders who were called based on false allegations about I.B., and had the authority and opportunity to stop it, but did not."  Dkt. No. 35 ¶ 81.  Although the pleading is less than clear, the facts alleged make it plausible that Cohen's report to the NYPD that I.B. was a danger to himself and others was knowingly false and made to encourage the police to remove him from the school.  The FAC contains facts from which it is plausible to infer that Cohen, or others at Success Academy, wanted I.B. removed from the school on January 6, 2023.[16]  It is reasonable to assume that a school official who contacts the NYPD intends, or at least foresees, that the officers will take some action that the school official herself could not take, including removal of the student from the school.  *See, e.g.*, *S.G. v. Success Acad. Charter Schs., Inc.*, 2019 WL 1284280, at *14–15 (S.D.N.Y. Mar. 20, 2019).  In that respect, the school official is differently situated from the civilian on the street who, observing what she believes might be a crime by persons who are otherwise strangers, calls 911 to have the authorities investigate and then leaves the scene.  Moreover, according to the FAC, Cohen would have had a motive to want I.B. removed and to make a false report to the police.  The school had attempted to remove I.B. from the classroom through suspensions on numerous occasions without success—a fact which Cohen was not only

---

[16] Indeed, the FAC alleges a course of conduct beginning the previous academic year that show that Harlem-2 employees, including Cohen, did not want I.B. to remain enrolled at the school by stating to Blanco that I.B. was not normal, Dkt. No. 35 ¶ 28, suggesting that in March 2022, I.B. had accrued forty days of suspensions rather than thirty, *id.* ¶ 31, and poking him in the eye, *id.* ¶ 39.

aware of, but actively took part in by attempting to enforce the suspensions even when they were deemed improper.  Dkt. No. 35 ¶ 31.  Cohen took further efforts to make I.B. and his family feel unwelcome at Harlem-2, telling Blanco that I.B. was "not normal" and seeking to have one of I.B.'s parents accompany him in the classroom through each school day.  *Id.* ¶ 28.  Further, in April 2023, within months of Cohen's decision to call emergency services on I.B., Success Academy took legal action to have I.B. removed from the school.  *Id.* ¶ 68.

The FAC also contains facts from which it plausibly can be inferred that Cohen knew her report was false, "thereby making the police agents in accomplishing defendant's intent to confine the plaintiff."  *TADCO Const. Corp.*, 700 F. Supp. 2d at 268–69 (quoting *Rateau v. City of New York,* 2009 WL 3148765, at *6 (E.D.N.Y. Sept. 29, 2009)).  According to the FAC, Cohen's 911 call followed numerous suspensions and related MDR meetings that concluded that I.B.'s conduct was a function of his disability, and I.B. was permitted back in the classroom without suspension—results inconsistent with reports that he was a danger to himself or others. And Cohen was aware that, in the previous academic year, I.B. had been psychiatrically evaluated and cleared to resume his studies.  It thus is plausible that Cohen, having been unsuccessful in getting I.B. excluded from school through suspensions because he was not a danger and because his conduct was simply a byproduct of his disability, effected the desired

exclusion by making false reports to the police.[17]  *See Rivers v. Towers, Perrin, Forster & Crosby Inc.*, 2009 WL 817852, at *4 (E.D.N.Y. Mar. 27, 2009).[18]

As to the remainder of the incidents where 911 was called, at most what Plaintiffs have done is allege that unnamed employees of Harlem-2 called 911, Dkt. No. 35 ¶¶ 61–64, 66, and, upon information and belief, that Cohen "either caused the false imprisonment by directing first responders to I.B. and falsely claiming he was a danger of serious physical injury or death to himself or others, or was advised in each case before arrival of first responders who were called based on false allegations about I.B., and had the authority and opportunity to stop it, but did not," *id.* ¶ 81.  But those allegations are conclusory, *see Iqbal*, 556 U.S. at 678–79, and, without an allegation of fact that makes the claim of belief plausible, are insufficient to state a claim for relief, *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010); *see Moreira v. Société Générale, S.A.*, 2023 WL 359446, at *3 (S.D.N.Y. Jan. 23, 2023).  And Plaintiffs cite no authority for the proposition that a civilian has a duty to intercede when another civilian has made a complaint to the authorities, even if he or she has reason to believe the complaint to be untrue.  Under § 1983, a defendant cannot be held liable merely "by reason of [her] supervision of others who committed the violation."  *Tangreti*, 983 F.3d at 619.

---

[17] At least one court has stated that "[t]o state a false arrest claim under § 1983 on an instigation of false arrest theory against a private defendant based on the provision of false information to the police, the plaintiff also must allege bad faith."  *Bertuglia*, 839 F. Supp. 2d at 721 n.2.  To the extent that bad faith is an independent element required to make a false arrest claim, and is not assumed by virtue of a defendant's knowing manufacture of a false claim, it is pleaded here, because Plaintiffs have alleged sufficient facts to show that Cohen improperly sought to exclude I.B. from Harlem-2 by various means.  Making a knowing false statement with such improper motive would constitute bad faith.  *See, e.g.*, *Flight Attendants in Reunion v. Am. Airlines, Inc.*, 813 F.3d 468, 474 (2d Cir.), *cert. denied*, 580 U.S. 919 (2016).
[18] Because of the Court's disposition of Plaintiffs' false arrest claim, it does not address Defendants' arguments that any alleged seizure was justified and reasonable in scope and that Cohen and Alvarez are entitled to qualified immunity.  *See* Dkt. No. 42 at 11–13.

B.      **Intentional Infliction of Emotional Distress**

Plaintiffs' third cause of action is an intentional infliction of emotional distress ("IIED") claim against all Defendants.  Dkt. No. 35 ¶¶ 85–89.  Plaintiffs allege that the conduct of each of the Defendants in constantly suspending I.B., denying him paraprofessional assistance in violation of his IEP "to create negative manifestations of I.B.'s disability," calling emergency services on I.B., telling Blanco that I.B. was "not normal," and initiating a false complaint against Blanco with the City's child welfare agency, ACS, were all extreme, outrageous, and beyond the bounds of decency and were carried out with the intent to inflict so much emotional harm on both Plaintiffs that Blanco would withdraw I.B. from Harlem-2.  *Id.* ¶¶ 86–87. Plaintiffs allege that Defendants caused both Plaintiffs to suffer extreme emotional distress and trauma.  *Id.* ¶ 88.

Defendants argue that Plaintiffs have failed to state a claim for intentional infliction of emotional distress for three reasons.  First, Defendants assert that Plaintiffs' claim against Success Academy and Harlem-2 fails because governmental entities cannot be liable for intentional infliction of emotional distress.  Dkt. No. 42 at 13.  Second, and independently sufficient to dismiss the claim, Defendants assert that Plaintiffs have failed to state a claim against all Defendants because the facts alleged fail to meet the high legal standard necessary for intentional infliction of emotional distress.  *Id.*  Third, Defendants argue that the intentional infliction of emotion distress claim is duplicative of Plaintiffs' other tort claims.  *Id.*

Under New York law, in order to state a claim for IIED, a plaintiff must plead: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress."  *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d

31

Cir. 1999); *see also Biswas*, 973 F. Supp. 2d at 535.[19]  "These requirements, especially that of

extreme and outrageous conduct, 'are rigorous and difficult to satisfy.'" *Moraes v. White*, 571 F.

Supp. 3d 77, 104 (S.D.N.Y. 2021) (quoting *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y.

1993)).  IIED is a "highly disfavored [tort] under New York law."[20]  *Turley v. ISG Lackawanna,*

*Inc.*, 774 F.3d 140, 158 (2d Cir. 2014); *see also Sesto v. Slaine*, 171 F. Supp. 3d 194, 202

(S.D.N.Y. 2016) (Nathan, J.) (noting that IIED claims are frequently dismissed on pre-answer

motion).  The conduct alleged must be "so outrageous in character, so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized society." *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985); *see also Chanko*

*v. Am. Broad. Cos. Inc.*, 49 N.E.3d 1171, 1179 (N.Y. 2016); *Murphy v. Am. Home Prods. Corp.*,

448 N.E.2d 86, 90 (N.Y. 1983).  However, in particularly outrageous cases, an IIED claim may

lie.  *See, e.g.*, *Travis v. Village of Dobbs Ferry*, 355 F. Supp. 2d 740, 756 (S.D.N.Y. 2005).

"Whether the conduct alleged may reasonably be regarded as so extreme and outrageous

as to permit recovery is a matter for the court to determine in the first instance."  *Stuto*, 164 F.3d

at 827.  Conduct may be "extreme and outrageous" where "there is a deliberate and malicious

campaign of harassment or intimidation." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122–

---

[19] "There is no recognized claim for intentional infliction of emotional distress under section
1983." *Schisler v. City of Rome*, 2017 WL 1418296, at *4 (N.D.N.Y. Mar. 22, 2017), *report and
recommendation adopted*, 2017 WL 1411533 (N.D.N.Y. Apr. 20, 2017) (quoting *Watson v. Doe*,
2016 WL 347339, at *32 (N.D.N.Y. Jan. 28, 2016)).

[20] The New York Court of Appeals has opted to read the tort of intentional infliction of
emotional distress narrowly because, "[u]nlike other intentional torts, intentional infliction of
emotional distress does not proscribe specific conduct . . . , but imposes liability based on after-
the-fact judgments about the actor's behavior. Accordingly, the broadly defined standard of
liability is both a virtue and a vice.  The tort is as limitless as the human capacity for cruelty.
The price for this flexibility in redressing utterly reprehensible behavior, however, is a tort that,
by its terms, may overlap other areas of the law, with potential liability for conduct that is
otherwise lawful.  Moreover, unlike other torts, the actor may not have notice of the precise
conduct proscribed." *Howell*, 612 N.E.2d at 702 (internal citations omitted).

23 (2d Cir. 2019) (quoting *Scollar v. City of New York*, 74 N.Y.S.3d 173, 178 (1st Dep't 2018));

*see Seltzer v. Bayer*, 709 N.Y.S.2d 21, 23 (1st Dep't 2000) ("Those few claims of intentional

infliction of emotional distress that have been upheld by this court were supported by allegations

detailing a longstanding campaign of deliberate, systematic and malicious harassment of the

plaintiff."); *Shannon v. MTA Metro-North R.R.*, 704 N.Y.S.2d 208, 209 (1st Dep't 2000) (finding

that the plaintiff's "detailed allegations that defendants intentionally and maliciously engaged in

a pattern of harassment, intimidation, humiliation and abuse, causing him unjustified demotions,

suspensions, lost pay and psychological and emotional harm over a period of years, were

sufficient to support the cause of action for intentional infliction of emotional distress").  Under

New York law, the proper inquiry is not merely whether an individual act might be outrageous,

but whether the action in its totality amounted to a deliberate and malicious campaign.  *Rich*, 939

F.3d at 123; *see McCollum v. Baldwin*, 2023 WL 5392684, at *10 (S.D.N.Y. Aug. 22, 2023).

Accepting as true the allegations in the FAC and giving Plaintiffs the benefit of every

plausible favorable inference, Plaintiffs have outlined a course of conduct that, *in the aggregate*,

could be understood to be outrageous, extreme in degree, atrocious and utterly intolerable in a

civilized society, at least to permit discovery to go forward.  *See Blasetti v. Pietropolo*, 213 F.

Supp. 2d 425, 428 (S.D.N.Y. 2002) (determining that, where a complaint could be read to allege

"fairly egregious conduct," the "prudent course [was] to deny the motions to dismiss to permit

the record to be better developed"); *see also Kaul v. Brooklyn Friends Sch.*, 199 N.Y.S.3d 117

(2d Dep't 2023).  Over the course of more than a year, Defendants undertook conduct, including

subjecting I.B. to numerous unjustified suspensions, that ultimately led Blanco to withdraw I.B.

from Harlem-2.  Courts have long recognized the weighty consequences of suspensions, *see*

*Goss v. Lopez*, 419 U.S. 565, 576 (1975) ("'[E]ducation is perhaps the most important function

of state and local governments,' and the total exclusion from the educational process for more

than a trivial period . . . is a serious event in the life of a suspended child." (quoting *Brown v. Bd.

of Educ. of Topeka*, 347 U.S. 483, 493 (1954))); *see also Paynter v. State*, 797 N.E.2d 1225,

1228 (N.Y. 2003).  Defendants nevertheless subjected I.B. to a lengthy and gratuitous series of

suspensions over a relatively short time period, despite the fact that all but one of those

suspensions were determined to be the product of his disability and could not be enforced.  Dkt.

No. 35 ¶¶ 18, 26, 28, 29, 37, 41, 42, 47, 48.  Defendants did so while denying I.B. the

paraprofessional services that were required by his IEP which could have prevented the conduct

that gave rise to the suspensions.  *Id.* ¶¶ 45, 52.  School staff then repeatedly also called the

authorities on I.B. and, on at least one occasion, caused him to be sent involuntarily to the

hospital, despite knowing that previous psychiatric evaluations had indicated that I.B. was not a

threat to himself or others.  *Id.* ¶¶ 58–64.  Defendants also stood by without taking any action

while other students at the school bullied I.B.  *Id.* ¶ 51.  And, as if to reinforce the message that

I.B. and his family were not welcome at Harlem-2, Cohen accused Blanco of not properly caring

for I.B. and then, *id.* ¶¶ 50, 54–55, when Blanco complained to NYSED that Harlem-2 was not

complying with the terms of I.B.'s IEP, filed a false accusation against her with the ACS in

retaliation for her complaint, *id.* ¶¶ 52, 57.  Defendants did so all the while repeatedly making it

clear to I.B. and to Blanco that I.B. was unwelcome at Harlem-2 and that the school was not a fit

for him.  *Id.* ¶¶ 23–24, 28, 46.  And the FAC alleges that this conduct has caused both Blanco

and I.B. severe emotional distress.  *Id.* ¶ 88; *see, e.g.*, *Waterbury v. N.Y.C. Ballet, Inc.*, 168

N.Y.S.3d 417, 426 (1st Dep't 2022).

Such gratuitous conduct, if engaged in by a single defendant or at the behest of a single defendant or together as a concerted action, would be sufficiently egregious to plausibly plead a claim for intentional infliction of emotional distress and for discovery to go forward. *See Moraes*, 571 F. Supp. 3d at 105; *Biswas*, 973 F. Supp. 2d at 536; *Neufeld v. Neufeld*, 910 F. Supp. 977, 980–81 (S.D.N.Y. 1996) (continuous course of harassment including confining one plaintiff to a psychiatric facility, filing false complaints about another plaintiff with government agencies, and threatening the health aide of another plaintiff sufficed for IIED claim); *Calicchio v. Sachem Cent. Sch. Dist.*, 185 F. Supp. 3d 303, 314–15 (E.D.N.Y. 2016) (student adequately stated IIED claim where he alleged that he was threatened by authority figures, pulled out of class and forced to work on school computers for free, and later expelled); *Kaminski v. United Parcel Serv.*, 501 N.Y.S.2d 871 (1st Dep't 1986) (allegations that plaintiff was wrongfully accused of stealing money, held in an office against his will, threatened with criminal prosecution if he did not confess, and forced to confess sufficient to state IIED claim); *see generally Hughes v. Patrolmen's Benevolent Ass'n of City of New York, Inc.*, 850 F.2d 876 (2d Cir.), *cert. denied*, 488 U.S. 967 (1988) (campaign of police harassment held sufficient to constitute IIED).

Plaintiffs nevertheless fail to state an IIED claim because, as a matter of law, Plaintiffs cannot plead a claim of IIED against Success Academy or Harlem-2, and, as to the individual defendants, Plaintiffs do not plead that the conduct was carried out or orchestrated by a single defendant or through a conspiracy of the individual defendants.  First, Plaintiffs cannot make out a claim against the municipal defendants.  Plaintiffs' claims against Success Academy and Harlem-2 fail because New York law provides that "claims of intentional infliction of emotional distress against government bodies are barred as a matter of public policy."  *Dillon v. City of*

*New York*, 704 N.Y.S.2d 1, 7 (1st Dep't 1999); *see also Gazzola v. County of Nassau*, 2022 WL

2274710, at *15 (E.D.N.Y. June 23, 2022) ("[I]t is well settled that public policy bars claims

sounding in intentional infliction of emotional distress against a government entity." (quoting

*J.H. v. Bratton*, 248 F. Supp. 3d 401, 416 n.10 (E.D.N.Y. 2017))); *Ramsaroop v. Dep't of Educ.*

*of N.Y.C.*, 2022 WL 376029, at *9 (S.D.N.Y. Feb. 8, 2022) (same); *Crvelin v. Bd. of Educ. of*

*City Sch. Dist. of City of Niagara Falls*, 43 N.Y.S.3d 614, 615 (4th Dep't 2016) (same).[21]

Success Academy, as a charter management organization, and Harlem-2, as a public charter

school, constitute government entities. *See, e.g.*, N.Y. Educ. Law § 2853(1)(c) ("A charter

school shall be deemed an independent and autonomous public school, . . . [and] [t]he charter

entity and the board of regents shall be deemed to be the public agents authorized to supervise

and oversee the school."); *Patrick*, 354 F. Supp. 3d at 209 n.24. Such claims may only be

pursued against the individual defendants. *See Noel Pane v. Town of Greenburgh*, 2012 WL

12886971, at *7 (S.D.N.Y. Mar. 21, 2012).

Second, Plaintiffs do not make any factual allegations against the individual defendants

sufficient to state a claim for intentional infliction of emotional distress. Plaintiffs do not plead

involvement or knowledge of a pattern of harassing conduct by any single individual defendant

---

[21] Curiously, Plaintiffs rely on *T.P. ex rel. Patterson v. Elmsford Union Free School District*,
2012 WL 5992748 (S.D.N.Y. Nov. 27, 2012) for the proposition that Success Academy can be
held vicariously liable for the tort of intentional infliction of emotional distress. Dkt. No. 44 at
10. But in *Patterson*, the court held that "public policy bars intentional infliction of emotional
distress claims against government entities" and thus dismissed the IIED claim against the school
district. 2012 WL 5992748, at *7 (S.D.N.Y. Nov. 27, 2012) (citing *D'Angelo-Fenton v. Town of
Carmel*, 470 F. Supp. 2d 387, 399 (S.D.N.Y. 2007)); *see also King v. City of New York*, 2013
WL 2285197, at *10 (E.D.N.Y. May 23, 2013) (rejecting claim that government defendant is
liable for intentional infliction of emotional distress on a *respondeat superior* theory). To the
extent that Plaintiffs cite *Patterson* for the proposition that a principal acts as a final policymaker
sufficient to make a claim for municipal liability where the ultimate harm that befell the plaintiff
was under the principal's control, the Second Circuit has expressly rejected that theory. *Agosto
v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 100–01 (2d Cir. 2020).

for that defendant to be held liable for intentional infliction of emotional distress, or a conspiracy by the individual defendants to harass I.B.  *See, e.g.*, *Spavone*, 719 F.3d at 135 ("It is well settled that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").  Plaintiffs allege that Moskowitz, as the CEO of Success Academy, Dkt. No. 35 ¶ 12, introduced the zero-tolerance approach to discipline which has been the subject of a complaint filed with the United States Department of Education by disabled students, *id.* ¶ 103, and revealed private and protected information about another Success Academy student in her memoir when the student's parent spoke to a reporter from the PBS NewsHour about the student's negative experience at Success Academy, *id.* ¶ 110.  But there are no allegations that Moskowitz was involved in what Plaintiffs assert was "a deliberate, systematic and malicious campaign to cause [Blanco] emotional harm with the motivating purpose of removing her disabled child from the school permanently."  Dkt. No. 44 at 10.

Plaintiffs allege only a few more facts as to Alvarez.  When he was the Assistant Principal at Harlem-2, Dkt. No. 35 ¶ 11, he told Blanco on March 2, 2022 that Harlem-2 was not a good fit for I.B. and that the school could not have him in building, *id.* ¶ 23, and later that same day, when Blanco asked Alvarez whether she could bring I.B. to school the following day, Alvarez told Blanco that he could "not tell [Blanco] not to bring him to school," *id.* ¶ 24.  Two weeks later, when Blanco asked Alvarez how I.B.'s day as she was picking I.B. up from school, Alvarez responded that he was not legally allowed to speak to Blanco.  *Id.* ¶ 30.  But "[i]nsults . . . and general harassment do not usually constitute a claim for IIED under New York law."  *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 535 (S.D.N.Y. 2015).

Plaintiff's most detailed allegations concern Cohen.  Dkt. No. 35 ¶ 10.  Plaintiff alleges that, on March 9, 2022, Cohen told Blanco that I.B. "isn't normal" and asked if either Blanco or

I.B.'s father could stay with him in the classroom.  *Id.* ¶ 28.  Plaintiff also alleges that on the occasion that an MDR meeting determined that I.B.'s behavior giving rise to a suspension was unrelated to his disability, Cohen told Blanco that I.B. had to start serving time for several of the suspensions he had accrued, *id.* ¶ 31, and that in late March 2022, after a different MDR meeting determined that I.B.'s alleged behavior was a manifestation of his disability, Cohen refused to suspend the 15 days of suspension he was then serving, *id.* ¶ 32.  On May 12, 2022, Cohen poked I.B. in the eye, *id.* ¶ 39, and on September 22, 2022, Cohen suggested that the school administer I.B.'s medications under the guidance of a mental health professional after Blanco forgot to timely do so once, *id.* ¶ 50, and thereafter continued to "imply" that Blanco was not giving I.B. his medication, *id.* ¶ 54.  On January 6, 2023, Cohen allegedly caused police officers to be called to the school based on I.B.'s behavior, *id.* ¶ 58, and in February 2023, Cohen informed Blanco that 911 was called due to I.B.'s behavior, *id.* ¶ 59.

None of this conduct rises to the level of being "extreme and outrageous."  Cohen's conduct towards Blanco can be characterized as humiliating, insulting and intended to intimidate, but "'[a]cts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain' an intentional infliction of emotional distress claim because such conduct 'is not sufficiently outrageous.'"  *Kinowski v. Home for Elderly Women of Montgomery Cnty., Inc.*, 2023 WL 4865531, at *13 (N.D.N.Y. July 31, 2023) (quoting *Semper v. N.Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 587 (E.D.N.Y. 2011)); *see also Gadson v. City of New York*, 67 N.Y.S.3d 287, 288 (2d Dep't 2017) ("[T]he isolated incident of name calling by the [school] janitor, while unquestionably objectionable, did not rise to the level of extreme and outrageous conduct required to sustain such a cause of action."); *Stuto*, 164 F.3d at 827 (explaining that even

malicious conduct is insufficient to state an IIED claim).  Cohen's conduct in its totality is not extreme or outrageous and does not amount to a deliberate and malicious campaign of harassment and intimidation.  "Defamatory statements generally cannot constitute extreme and outrageous behavior to support an intentional infliction of emotional distress claim."  *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 605 (S.D.N.Y. 2011) (collecting cases).  And, as noted, "[a]cts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of [IIED] because the conduct alleged is not sufficiently outrageous."  *Semper*, 786 F. Supp. 2d at 587 (quoting *Stevens v. New York*, 691 F. Supp. 2d 392, 399 (S.D.N.Y. 2009)).  Cohen's conduct, depending on the facts, may give rise to traditional tort liability for assault.  But the isolated examples which Plaintiff pleads against Cohen are neither extreme nor outrageous enough to give rise to liability for intentional infliction of emotional distress.  *See, e.g.*, *Doe v. Yeshiva Univ.*, 2023 WL 8236316, at *12 (S.D.N.Y. Nov. 28, 2023) (rejecting claim against school for flawed investigation of an incident where student was raped); *Bailey v. N.Y. L. Sch.*, 2017 WL 6611582, at *12 (S.D.N.Y. Dec. 27, 2017), *aff'd*, 2021 WL 5500078 (2d Cir. Nov. 24, 2021) (summary order); *Burrell v. City Univ. of N.Y.*, 995 F. Supp. 398, 416 (S.D.N.Y. 1998) (dismissing IIED claim where plaintiff alleged discriminatory and retaliatory conduct); *Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667, 681 (S.D.N.Y. 1995) (dismissing IIED claim where plaintiff was subjected to discriminatory comments about her pregnancy and gender, false allegations about her work ethic, and termination of her employment based on her pregnancy and gender).

Ultimately, Plaintiffs' claim for intentional infliction of emotional distress is based on the allegations that Blanco was subject to a campaign by individuals at the school to cause her

emotional harm and distress  by suspending I.B. from school on numerous occasions, setting him up for failure by depriving him the paraprofessional required by his IEP, making eight 911 calls based on false information, allowing I.B. to be bullied in school while rebuffing Blanco's requests to redress the bullying, and subjecting Blanco to insulting comments.  Dkt. No. 44 at 11–12.  But the FAC treats all of the Harlem-2 administrators and staff as an undifferentiated whole, without regard to individual involvement or even individual knowledge.  "Pleadings that fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim."  *Adamou v. County of Spotsylvania*, 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016) (citing *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order)).  The tort of intentional infliction of emotional distress, no different than any other individual torts, is based on individual conduct.  *See Stevens*, 691 F. Supp. 2d at 399 (dismissing intentional infliction of emotional distress claim where the plaintiff had "not alleged any specific conduct by any of the individual defendants . . . that would even come close to supporting such a claim"); *see also Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 194–95 (S.D.N.Y. 2001) (evaluating the conduct alleged by each individual defendant independently).  Although the Court considers the conduct of each Defendant in its totality rather than any individual act by that Defendant, *Rich*, 939 F.3d at 123, an individual cannot be held liable for conduct he or she did not commit or assist or agree upon and of which he and she was not aware, *see, e.g.*, *Jones v. Trump*, 971 F. Supp. 783, 787 (S.D.N.Y. 1997), *aff'd*, 1998 WL 1967891 (2d Cir. Sept. 21, 1998) (summary order).  Plaintiffs have not alleged individual conduct by any individual defendant that is sufficiently extreme or outrageous to satisfy the elements of the tort of intentional infliction of emotional distress and no tort lies against the entities.  The suspensions, failure to comply with I.B.'s IEP, and seven of the eight 911 calls are not alleged to have been

made by or at the behest of any of the individual defendants named in the FAC, and Plaintiffs do

not make allegations against any other defendants—either known or the four unidentified "John

Does" listed in the Complaint's caption—who may have been responsible for these acts. *See,*

*e.g.*, *Hicks v. Chavez*, 2023 WL 6960358, at *2 (Oct. 20, 2023) (deeming insufficient a

complaint that "name[d] unidentified 'John Doe' Defendants, but allege[d] no facts describing

those Defendants," and explaining that "[a]ny defendants named in the caption must also be

discussed in [the] Plaintiff's statement of claim"); *see also Raysor*, 2021 WL 230296, at *4.  Nor

have Plaintiffs alleged any conspiracy among the Defendants to cause emotional distress.

Accordingly, Plaintiffs' claim for intentional infliction of emotional distress fails as a matter of

law and is dismissed.[22]

---

[22] The cases upon which Plaintiffs rely, *see* Dkt. No. 44, are distinguishable.  In *Blasetti v. Pietropolo*, 213 F. Supp. 2d 425 (S.D.N.Y. 2002), the defendant-police detective subjected the plaintiff to a four-year campaign of harassment which included repeated telephone calls, public confrontations, indecent and sexual suggestions and comments, and requests for lewd photographs of herself after the plaintiff broke off an intimate relationship with him.  *Id.* at 427–28.  Even then, the court denied the motion to dismiss only as "the prudent course," while noting that the New York Court of Appeals had never yet upheld a claim of intentional infliction of emotional distress.  *Id.* at 428.  In *Travis v. Village of Dobbs Ferry*, 355 F. Supp. 2d 740 (S.D.N.Y. 2005), the court assessed the facts against each defendant individually, as the Court does here, and held that triable issues existed with respect only to those defendants who without any probable cause arrested plaintiff, illegally searched her vehicle, made knowingly false statements to her, and subjected her to an illegal strip search.  *Id.* at 756.  The court observed that it "had the misfortune to deal with a number of 'investigatory arrest' and 'investigatory strip search' cases since coming on the bench," with the facts of that particular case being "as outrageous as any [the judge] ha[d] seen.  The behavior of the defendants was completely unreasonable."  *Id.* at 754.  In *Benacquista v. Spratt*, 217 F. Supp. 3d 588 (N.D.N.Y. 2016), the court dismissed a plaintiff's claim for intentional infliction of emotional distress at the pleading stage based on allegations of an illicit sexual relationship.  *Id.* at 606.  Finally, in *Shannon v. MTA Metro-North R.R.*, 704 N.Y.S.2d 208 (1st Dep't 2000), the plaintiff's complaint contained "detailed allegations that [individual] defendants intentionally and maliciously engaged in a pattern of harassment, intimidation, humiliation and abuse, causing him unjustified demotions, suspensions, lost pay and psychological and emotional harm over a period of years."  *Id.* at 209.

### C.       Abuse of Process

Plaintiffs next allege that unspecified Defendants committed the constitutional and state law tort of abuse of process, defined as "causing process to issue lawfully but to accomplish some unjustified purpose," *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Tchrs. Ass'n, Inc.*, 43 N.E.2d 278, 280 (N.Y. 1975), by (1) filing a complaint with ACS to initiate an investigation against Blanco with the intent to harm Blanco, Dkt. No. 35 ¶ 92–93; and (2) initiating the temporary civil commitment of I.B. by calling 911, *id.* ¶ 94.  Plaintiffs allege that Success Academy has on numerous occasions filed frivolous ACS allegations against parents of students with disabilities which have been found to be unfounded or unsubstantiated. *Id.* ¶ 93.  They allege that Defendants employed legal process for the collateral objectives of harassing I.B. and Blanco, causing them emotional distress, and forcing I.B. to leave the school. *Id.* ¶¶ 95–96.  Defendants respond (1) that neither the initiation of the ACS complaint nor the hospitalization of I.B. constitutes cognizable legal process;[23] (2) that even if either instance constituted legal process within the meaning of the tort, Plaintiffs have not properly alleged improper use of such process; and (3) to the extent that Plaintiffs' abuse of process claim is against any individual defendants, Plaintiffs have not sufficiently alleged personal liability.  Dkt. No. 42 at 16–18.  Defendants are correct on all three counts.

---

[23] Plaintiffs do not respond to Defendants' argument that an abuse of process claim cannot be based on the 911 call that led to I.B. being sent temporarily to the hospital and thus that claim is deemed abandoned.  *See, e.g., Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016) (summary order) ("Even '[w]here abandonment by a counseled party is not explicit,' a court may infer abandonment 'from the papers and circumstances viewed as a whole.'" (quoting *Jackson*, 766 F.3d at 195)); *see also Felix v. City of New York*, 344 F. Supp. 3d 644, 654 (S.D.N.Y. 2018) (Nathan, J.) ("Courts may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's argument that the claim should be dismissed.").  The Court addresses it here for purposes of completeness.

As with claims for false imprisonment, "[w]hen a plaintiff asserts an abuse-of-process claim under Section 1983," the Court "turn[s] to state law to find the elements." *Mangino v. Incorporated Village of Patchogue*, 808 F.3d 951, 958 n.5 (2d Cir. 2015). To state a claim for abuse of process under New York law, a plaintiff must plausibly allege that the defendant "(1) employed regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Elek v. Incorporated Village of Monroe*, 815 F. Supp. 2d 801, 810 (S.D.N.Y. 2011) (alterations omitted) (quoting *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)); *see HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 106 (S.D.N.Y. 2020). "A malicious motive alone . . . does not give rise to a cause of action for abuse of process." *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326 (N.Y. 1984); *see also Hoffman v. Town of Southampton*, 893 F. Supp. 2d 438, 449 (E.D.N.Y. 2012) (Bianco, J.) ("[I]f an individual does no more than initiate and prosecute a criminal or civil action to its authorized conclusion, no abuse of process can be shown, regardless of the individual's malicious intent in doing so." (citation omitted)). And, although not required for Section 1983 claims, under New York law, a plaintiff proceeding under a theory of abuse of process must allege special damages. *See, e.g.*, *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 212 (S.D.N.Y. 2014).

First, Plaintiffs have failed to allege any cognizable legal process. "[L]egal process means that a court issued the process, and the plaintiff will be penalized if he violates it." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (citing *Mormon v. Baran,* 35 N.Y.S.2d 906, 909 (N.Y. Sup. Ct. 1942)). "Process is a 'direction or demand that the person to whom it is directed shall perform or refrain from the doing of some prescribed act.'" *Williams v. Williams*, 246 N.E.2d 333, 335 (N.Y. 1969) (citation omitted). "It follows that there must be an unlawful interference

with one's person or property under color of process in order that action for abuse of process may lie." *Id.*; *see also Roelcke v. Zip Aviation, LLC*, 571 F. Supp. 3d 214, 233 (S.D.N.Y. 2021) ("[T]o qualify as legal process for purposes of an abuse-of-process claim, the court-issued writ must not only direct or demand that the person to whom it is directed shall perform or refrain from doing some prescribed act, but also interfere with one's person or property." (quoting *Manhattan Enter. Grp. LLC v. Higgins*, 816 F. App'x 512, 514 (2d Cir. 2020) (summary order))).  Examples of writs which can be so abused include writs of "attachment, execution, garnishment, or sequestration proceedings, or arrest of the person, or criminal prosecution, or even such infrequent cases as the use of a subpoena for the collection of a debt." *HC2, Inc.*, 510 F. Supp. 3d at 106 (quoting *Williams*, 246 N.E.2d at 335 n.1); *see also Greco v. Christoffersen*, 896 N.Y.S.2d 363, 365–66 (2d Dep't 2010) (holding that "the mere commencement of a lawsuit cannot serve as the basis for a cause of action alleging abuse of process," and that interference with person or property comes from "resort to a provisional remedy, such as arrest, attachment, injunction, receivership, or notice of pendency"); *see also Manhattan Enter. Grp.*, 816 F. App'x at 514 (affirming dismissal of abuse of process claim based on allegations that the defendant "filed and prosecuted a series of duplicative, frivolous, and malicious lawsuits aimed at harassing" the plaintiffs).

Plaintiffs also fail to state a claim for abuse of process for the independent reason that Plaintiffs do not allege that any of the Defendants obtained any *court*-issued process.  Plaintiffs allege only that Harlem-2 filed a false complaint with ACS initiating an investigation into Blanco's care of I.B to retaliate against Blanco for filing a complaint with NYSED regarding the school's noncompliance with I.B.'s IEP.  Dkt. No. 35 ¶¶ 57, 92.  But the fact that the school filed a complaint with ACS against Blanco is not sufficient to give rise to a claim of abuse of process,

*See, e.g.*, *Walia v. Holder*, 59 F. Supp. 3d 492, 512 (E.D.N.Y. 2014) (rejecting as insufficient a claim for abuse of process where the plaintiff was merely "administratively referred to" an agency's disciplinary body); *Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC*, 2013 WL 417406, at *16 (S.D.N.Y. Feb. 4, 2013) ("[T]he [State Liquor Authority] proceeding does not fall within the definition of 'process' for the purpose of an abuse of process claim in New York because it is not a court proceeding.").  Plaintiffs do not allege that ACS took any action based on that complaint, much less that any form of process was issued.  Plaintiffs' allegation that the ACS complaint was filed in retaliation for Blanco's complaint with NYSED for failure to comply with I.B.'s IEP does not, standing alone, save their claim.  "It is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against [her]," instead, "[t]he use of the instrument or process must have itself been improper."  *Bertuglia v. City of New York*, 133 F. Supp. 3d 608, 638 (S.D.N.Y. 2015).  The same is true with respect to what Plaintiffs characterize as the "temporary civil commitment" of I.B.  Dkt. No. 35 ¶ 94.  Plaintiffs do not allege that such temporary commitment was the product of any court-issued process.  Plaintiffs allege simply that an unnamed Harlem-2 employee called 911 and that, as a result, I.B. was taken to a hospital, where he was cleared within hours and released.  *Id.* ¶¶ 59–60.  Such conduct—if it were alleged that it was malicious and resulted in a deprivation of I.B.'s liberty—might give rise to a malicious prosecution claim.  *See V.A. v. City of New York*, 2023 WL 6254790, at *7 (S.D.N.Y. Sept. 26, 2023).  But Plaintiffs do not bring a malicious prosecution claim and do not allege any deprivation of liberty.  And, like Plaintiffs' allegation with respect to the retaliatory ACS complaint, Plaintiffs' allegation that the 911 call was made for a collateral purpose, Dkt. No. 35 ¶ 95, is not enough to give rise to a claim for abuse of process, *see, e.g.*, *Behrens v. City of Buffalo*, 192 N.Y.S.3d 869, 871 (4th Dep't 2023) (an allegation that "defendant's use of

process furthered the goal of harassing and intimidating plaintiff" failed to state a claim for abuse of process); *Dobies v. Brefka*, 710 N.Y.S.2d 438, 441 (3d Dep't 2000) ("The 911 call does not give rise to an abuse of process claim because, although the Sheriff investigated the complaint, no process was issued nor was a proceeding initiated."); *cf. Casa de Meadows Inc. (Cayman Islands) v. Zaman*, 908 N.Y.S.2d 628, 632 (1st Dep't 2010) (finding that "process did not issue," thus dooming the plaintiff's abuse of process claim, because the request for legal process—there, the "request for a temporary restraining order[,] was denied").

Even assuming that an administrative complaint or a call to the police could constitute "process" within the meaning of the tort, Plaintiffs do not allege any "improper use of process after it [wa]s issued." *Williams*, 246 N.E.2d at 335; *see also Gilman v. Marsh & McLennan Cos.*, 868 F. Supp. 2d 118, 131 (S.D.N.Y. 2012), *aff'd*, 654 F. App'x 16 (2d Cir. 2016) (summary order) (abuse of process requires improper use of process after it is issued); *Richardson v. N.Y.C. Health & Hosps. Corp.*, 2009 WL 804096, at *16–17 (S.D.N.Y. Mar. 25, 2009) (Sullivan, J.) (same); *Roelcke v. Zip Aviation, LLC*, 2019 WL 10856680, at *6 (S.D.N.Y. Jan. 8, 2019) (same).[24] In New York, "the pursuit of a collateral objective must occur after the

---

[24] Plaintiffs rely upon Judge Irizarry's decision in *V.S. ex rel. T.S. v. Muhammad*, 581 F. Supp. 2d 365, 391 (E.D.N.Y. 2008), in which the court dismissed an abuse of process claim brought against City defendants for initiating family court proceedings against the parent plaintiffs while permitting the claim against private defendants to go forward. The court there relied upon and quoted from the New York Court of Appeals decision in *Dean v. Kochendorfer*, 143 N.E. 229 (N.Y. 1924), in which Judge Pound opined that an abuse of process claim would lie against a magistrate who "instigates a prosecution before himself without probable cause, and deliberately uses the process issued by him therein, not for the legitimate purpose of hearing the case, but to show his authority and to gratify his personal feels of importance." *Id.* at 231. In other words, *Dean* and presumably *T.S.*, relied upon an abuse of process. *See Roelcke*, 2019 WL 10856680, at *6 ("While the mere institution of a civil action by summons and complaint is not legally considered a process that is capable of being abused for the purposes of this tort, repeated and improper use of other processes in combination with the filing of a civil lawsuit has been found sufficient to state a cause of action for abuse of process."). Accordingly, they are inapposite here.

process is issued; the mere act of issuing process does not give rise to a claim." *Orellana v. Macy's Retail Holdings, Inc.*, 2018 WL 3368716, at *16 (S.D.N.Y. July 10, 2018) (quoting *Gilman*, 868 F. Supp. 2d at 131).  In this case, however, Plaintiffs do not allege any conduct taken by any of the Defendants after either the ACS complaint or the 911 call.  The abuse of process claim fails under both federal and state law for that additional reason.[25]

---

[25] Defendants argue that a Section 1983 claim may not be predicated on a claim of malicious abuse of civil process. Dkt. No. 42 at 16–17.  The Second Circuit has so stated on numerous occasions.  *See, e.g.*, *Cook*, 41 F.3d at 79–80 ("We [have] stated broadly that 'section 1983 liability . . . may not be predicated on a claim of malicious abuse of [civil] process.'" (quoting *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.), *cert. denied*, 506 U.S. 819 (1992))). Plaintiff responds with case law from this District stating that "the removal of a child from her parents, via civil family court proceedings, implicates sufficient constitutional interests to support a *malicious prosecution claim*." *Kurtz v. Hansell*, 2021 WL 1143619, at *13 (S.D.N.Y. Mar. 24, 2021) (emphasis added); *see also V.A.*, 2023 WL 6254790, at *7 (same); *Grullon v. Admin. for Child. Servs.*, 2021 WL 981848, at *10 (S.D.N.Y. Mar. 16, 2021) (same).  The district court's decision in *Kurtz* was based, in part, on the Second Circuit's decision in *Washington v. County of Rockland*, 373 F.3d 310 (2d Cir. 2004) (Sotomayor, J.), in which the Circuit stated that its "case law does not forbid a § 1983 claim premised on a civil or administrative proceeding," but that such claims must be premised on "a deprivation of liberty sufficient to constitute a violation of plaintiffs' Fourth Amendment rights."  *Id.* at 317.  There are important differences, however, between the tort of malicious prosecution, which "concerns the improper issuance of process," and the tort of abuse of process, which turns on "the improper use of process after it is regularly issued," *Cook*, 41 F.3d at 80 (internal citations omitted); the Second Circuit has stated that the "distinction between civil and criminal abuse of process is critical for section 1983 purposes," *id.*, and, even after *County of Rockland*, has reiterated that "section 1983 liability . . . may not be predicated on a claim of malicious abuse of' civil process," *Green v. Mattingly*, 585 F.3d 97, 104 (2d Cir. 2009) (quoting *Cook*, 41 F.3d at 79–80). Thus, it is questionable whether under current Second Circuit law a claim of malicious abuse of civil process can be a predicate for a Section 1983 claim.  *See Zubko-Valva v. County of Suffolk*, 607 F. Supp. 3d 301, 317 (E.D.N.Y. 2022) (holding that because the only proceedings plaintiff was subject to were civil, she could not state an abuse of process claim); *Gerasimov v. Amalgamated Housing Corp.*, 2021 WL 6338522, at *4 (S.D.N.Y. Dec. 17, 2021), *report and recommendation adopted*, 2022 WL 94879 (S.D.N.Y. Jan. 10, 2022) (citing *Cook* for proposition that a 1983 claim may not be based on malicious abuse of civil process); *Alroy v. N.Y.C. L. Dep't*, 69 F. Supp. 3d 393, 402 (S.D.N.Y. 2014) (same).  However, the Court need not determine whether a Section 1983 claim could ever be brought based on malicious abuse of civil process if the deprivation of liberty effected by a misuse of process was serious enough and the misuse of civil process grave enough.  Plaintiffs' claim fails for other reasons.

### D.        Supervisory Liability

Plaintiffs appear to assert supervisory liability against Moskowitz as CEO of Success Academy.  Defendants argue that Plaintiffs' claim for supervisory liability should be dismissed because Plaintiffs do not allege facts that would establish that Moskowitz violated the Constitution through her own action.  Dkt. No. 42 at 3, 18.

The Second Circuit has held that "there is no special rule for supervisory liability." *Tangreti*, 983 F.3d at 618.  "To establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023); *see Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004) ("[A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983.").  Thus, a defendant cannot be held liable under Section 1983 "by reason of [her] supervision of others who committed the violation." *Tangreti*, 983 F.3d at 619; c*f. Braxton v. Bruen*, 2023 WL 7478331, at *1 (2d Cir. Nov. 13, 2023) (summary order) (holding that district court properly reconsidered its prior reliance on the Second Circuit's decision in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995), because the Circuit's recent decision in *Tangreti* clarified that a plaintiff "must 'plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution'" (quoting *Tangreti*, 983 F.3d at 616)).  "'The violation must be established against the supervisory official directly' through his or her own individual conduct as it relates to the specific, underlying offenses at issue." *Roman v. City of Mount Vernon*, 2022 WL 2819459, at *16 (S.D.N.Y. July 19, 2022) (quoting *Tangreti*, 983 F.3d at 618).

Plaintiffs do not allege that Moskowitz was involved in the specific offenses complained of.  Accordingly, Plaintiffs have failed to allege that Moskowitz "through [her] own individual

actions, has violated the Constitution." *Tangreti*, 983 F.3d at 616 (quoting *Iqbal*, 556 U.S. at 676).

### E.      Municipal Liability

Plaintiffs also bring claims of municipal liability under Section 1983 as to "Success Network"—an entity undefined in the FAC but which the Court construes to be Success Academy.  Dkt. No. 35 ¶¶ 99–116.  For purposes of § 1983 claims, "school districts are considered to be local governments and are subject to similar liability as local governments." *J.L. on behalf of J.P. v. N.Y.C. Dep't of Educ.*, 324 F. Supp. 3d 455, 469 (S.D.N.Y. 2018); *see also Patrick*, 354 F. Supp. 3d at 209 n.24.  Under the standards set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality can be held liable under § 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality.  *Id.* at 690–91.  "[T]o plead a § 1983 claim against a municipality, . . . a plaintiff must allege: '(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury.'"  *Savarese*, 547 F. Supp. 3d at 354 (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008), *cert. denied*, 558 U.S. 933 (2009)); *see also Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir. 1995) ("In order to establish the liability of a municipality in an action under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must establish that the violation of his constitutional rights resulted from a municipal custom or policy.").  Municipal agents "are not vicariously liable under § 1983 for their employees' actions."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011).

Plaintiffs allege, *inter alia*, that Success Academy's "failures to . . . discipline, or supervise demonstrated willful deliberate indifference."  Dkt. No. 35 ¶ 115.  Under the failure to

supervise or discipline theory, a plaintiff must show "that the [municipal agent] failed to adequately supervise or discipline its employees (thereby implicitly encouraging or ratifying their unlawful conduct) . . . [and] that such a failure of supervision or discipline was tantamount to deliberate indifference." *Alwan v. City of New York*, 311 F. Supp. 3d 570, 578 (E.D.N.Y. 2018) (collecting cases). Deliberate indifference in this context is shown when "the need for more or better supervision to protect against constitutional violations was obvious." *Vann*, 72 F.3d at 1049. "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.* In the context of a failure to supervise, "there is no requirement that complaints result in a formal finding of misconduct for such complaints to support findings of failure to supervise." *Felix*, 344 F. Supp. 3d at 662.

The Court need not and does not consider whether Plaintiffs' allegations are sufficient to give rise to municipal liability for any of the underlying alleged constitutional violations claims by Plaintiffs because Plaintiffs have failed to plead an underlying constitutional violation by a state actor. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Id.*

### F.    *Respondeat Superior*

Finally, Plaintiffs attempt to assert a cause of action for *respondeat superior*. Dkt. No. 35 ¶¶ 117–119. "The doctrine of *respondeat superior* 'renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment.'" *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 455 (S.D.N.Y. 2012) (quoting *Riviello v. Waldron*, 391 N.E.2d

1278 (N.Y. 1979)); *see also Girden v. Sandals Int'l*, 262 F.3d 195, 205 (2d Cir. 2001).  Although Plaintiffs do not expressly specify which Defendants are liable under a theory of *respondeat superior*, because, "[u]nder the common-law doctrine of *respondeat superior*, an employer—including the State—may be held vicariously liable for torts, including intentional torts, committed by employees acting within the scope of their employment," *Rivera v. State*, 142 N.E.3d 641, 645 (N.Y. 2019), the Court construes the claim to concern Defendants Success Academy and Harlem-2.

Defendants contend that this claim should be dismissed because "[a] municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  Dkt. No. 42 at 22 (quoting *Monell*, 436 U.S. at 691).  While this is correct to the extent that Plaintiffs' *respondeat superior* claim alleges constitutional violations through Section 1983, the Supreme Court's decision in *Monell* would not be an obstacle to Plaintiffs' state law claims.  *See, e.g.*, *Raysor v. Port Auth. of N.Y. & N.J.*, 768 F.2d 34, 38 (2d Cir. 1985), *cert. denied*, 475 U.S. 1027 (1986).

Under New York law, an employer is vicariously liable for the actions of an employee only where the acts in question are "committed in furtherance of the employer's business and within the scope of employment."  *N.X. v. Cabrini Med. Ctr.*, 765 N.E.2d 844, 847 (N.Y. 2002). However, because "*respondeat superior* does not stand alone as a substantive cause of action" under New York law, this cause of action must be dismissed.  *Jain v. City of New York*, 2021 WL 6064204, at *3 (S.D.N.Y. Dec. 22, 2021) (quoting *Biswas*, 973 F. Supp. 2d at 540); *see also Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 112 (E.D.N.Y. 2011) ("*Respondeat superior* is not an independent cause of action, but a theory that must attach to an underlying claim.").

### III.    Leave to Amend

Federal Rule of Civil Procedure 15(a) directs courts to "freely give leave" to amend a complaint "when justice so requires."  Fed. R. Civ. P. 15(a).  "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."  *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).  However, "[l]eave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 200 (2d Cir. 2007)).

At this point, the Court cannot find that Plaintiffs' claims would be futile.  "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim."  *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018) (quoting *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 224–25 (2d Cir. 2017)). And at this early stage of the action, where substantial discovery has not even begun, the Court finds no undue delay.  *McCarthy*, 482 F.3d at 201–02; *see Dilworth*, 914 F. Supp. 2d at 460 (finding no prejudicial delay in granting amendment over one year after the second amended complaint was filed because discovery had not substantially progressed).[26]  Nor does the Court identify any prejudice that would accrue to Defendants.  *See, e.g.*, *Cano v. DPNY, Inc.*, 287 F.R.D. 251, 261–62 (S.D.N.Y. 2012).

### CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED and the second, third, fourth, fifth, and sixth causes of action are dismissed without prejudice to the filing of an

---

[26] The parties have served initial disclosures, initial requests for production of documents, and interrogatories, but, as noted, further discovery was stayed at the request of the parties.  Dkt. Nos. 50–51.

amended complaint within thirty days of the date of the Court's Order, by April 5, 2024.

Plaintiffs will have sixty days from the date of this Court's order, by May 6, 2024, to effect

service on Defendant Alvarez (if he is named in an amended complaint).[27]

      The Clerk of Court is respectfully directed to close Dkt. No. 41.


      SO ORDERED.

Dated: March 6, 2024
     New York, New York
                                  LEWIS J. LIMAN
                            United States District Judge

---

[27] The Court denies Plaintiffs' request to order Defendants to provide an address where Alvarez may be served but will permit Plaintiffs to use the tools of civil discovery, within reason, to obtain such information.