UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/10/2026

MARILYN BLANCO, on behalf of herself and her infant
child I.B.

         Plaintiff,

    -v-

SUCCESS ACADEMY CHARTER SCHOOLS, INC., et
al.,

        Defendants.

------------------------------------------------------------------------X

23-cv-1652 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendants Success Academy Charter Schools, Inc. ("Success Academy"), Success Academy Charter School Harlem 2 ("Harlem-2" and with Success Academy, the "Success Academy Defendants"), and Principal Amelia Cohen ("Cohen" and with Success Academy and Harlem-2, "Defendants") move, pursuant to Federal Rule of Civil Procedure 56, for an order granting them summary judgment on the remaining claims in this action: (1) the claim on behalf of student I.B. under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against the Success Academy Defendants; and (2) the claim on behalf of I.B. and his mother Marilyn Blanco for intentional infliction of emotional distress ("IIED") against Cohen.  Dkt. Nos. 111, 116.  For the reasons that follow, the motion is GRANTED.

## BACKGROUND

Success Academy is a charter school network.  Dkt. No. 55 (Second Amended Complaint, or "SAC") ¶ 1; Dkt. No. 62 ("Answer") ¶ 1.  Harlem-2 is a K-4 charter school in the Success Academy network located in Harlem.  Dkt. No. 116 (Defendants' Statement of Undisputed Facts, or "DSUF") ¶¶ 1, 3; Dkt. No. 126 (Plaintiff's Counterstatement of Undisputed

Facts, or "CSUF") ¶ 1, 3.  Cohen was principal of Harlem-2 while I.B. was a student there. DSUF ¶ 2; CSUF ¶ 2.

I.B. is a nine or ten year old child with attention deficit hyperactivity disorder ("ADHD"). DSUF ¶ 11; CSUF ¶ 11; SAC ¶ 2; Answer ¶ 2.  Plaintiff Marilyn Blanco ("Blanco" or "Plaintiff") is his mother.  DSUF ¶ 8; CSUF ¶ 8.  I.B. attended Harlem-2 during the 2021–22 and 2022–23 school years.  DSUF ¶ 1; CSUF ¶ 1.

## I.    Initial Evaluation and Individualized Education Program

In fall of 2021, when I.B. was in kindergarten, he began exhibiting behaviors that led Harlem-2 to suspend him.  DSUF ¶ 5; CSUF ¶ 5.  He received his first suspension notice on December 7, 2021 for throwing classroom materials around the room, Dkt. No. 113-5, and received additional suspension notices in February and March 2022, Dkt. No. 132 (Defendants' Response Statement of Undisputed Facts, or "RSUF") ¶ 4; Dkt. No. 143-7.  On March 3, 2022, as a result of I.B.'s behavior, the school initiated the process of evaluating I.B. for an Individualized Education Program ("IEP") through the New York City Department of Education's Committee on Special Education ("CSE").  DSUF ¶ 8;  RSUF ¶ 6; Dkt. No. 113-9. An IEP is a written plan, developed under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, that sets out the specialized instruction, services, and supports a student with a disability is entitled to receive.  *Id.* § 1414(d).  In initiating the IEP process, the school reported that its main concern was "social-emotional" and that I.B. started the school year well but had "since been having a difficult time with behaviors in the classroom, and his ability to control his emotions when he is upset."  Dkt. No. 113-9.

On March 21, 2022, the CSE completed a psychoeducational evaluation of I.B.  RSUF ¶ 12.  It revealed clinically significant scores on scales measuring hyperactivity, internalizing

2

problems, anxiety, depression, attention, and the Behavioral Symptoms Index.  RSUF ¶ 13; Dkt. No. 136-5.  On April 8, 2022, I.B. was diagnosed with ADHD.  DSUF ¶ 11; Dkt. No. 113-14.

On May 6, 2022, the school conducted a Functional Behavior Assessment ("FBA") and prepared a Behavior Intervention Plan ("BIP") to better understand I.B.'s behaviors and their causes and to help staff members in managing those behaviors going forward.  DSUF ¶ 12; Dkt. Nos. 113-12, 113-13.  The FBA identified as goals of the FBA and BIP process reducing and eliminating physically aggressive behaviors from I.B., reducing and eliminating off task behaviors including classroom elopement, increasing skills for appropriate communication of emotions, increasing use of coping skills for frustration, and improving attention and focus on assignments, tasks, and instruction.  Dkt. No. 113-12.

On May 10, 2022, I.B. received his IEP.  DSUF ¶ 14; Dkt. No. 113-16; Dkt. No. 136-5.[1] The IEP required that I.B. be supported by a paraprofessional on a 1:1 basis while in school— meaning that a dedicated adult would be assigned to work with him throughout the school day. *Id.*  The IEP took effect on May 24, 2022.  RSUF ¶ 19; Dkt. No. 136-5.

## II.     Paraprofessional Absences

Harlem-2 contracted with the CSE's district, CSE-10, to arrange paraprofessional services.  RSUF ¶ 40.  During the 2022–23 school year, I.B.'s IEP-mandated 1:1 paraprofessional was absent on at least 11 occasions from the start of the school year through November 29, 2022, and no paraprofessional services were provided during lunch and recess during that period.  RSUF ¶¶ 37–38; Dkt. No. 127-12.  Some paraprofessionals quit or declined to continue working with I.B. after he became physically aggressive toward them.  DSUF ¶ 44; Dkt. Nos. 113-31, 113-32.  When paraprofessionals were absent, the school communicated the

---

[1] Plaintiff states that the IEP was received by May 6, 2022.  RSUF ¶ 18.  The evidence reflects, however, that the IEP is dated May 10, 2022.  Dkt. No. 136-5.  The difference is immaterial.

need for a substitute with CSE-10 and, when a substitute was unavailable, staff members provided I.B. with additional support. DSUF ¶¶ 41, 46–50; *see* Dkt. Nos. 143-23, 143-24 (noting staff check-ins on days without a paraprofessional). Cohen encouraged Blanco to contact the CSE to inquire about requesting a second paraprofessional. DSUF ¶ 47; CSUF ¶ 47.

Due to the paraprofessional absences, Blanco filed a complaint with the New York State Education Department ("SED"). Dkt. No. 143-12. In December 2022, SED determined that both Harlem-2 and CSE-10 were in violation of Education Law § 2853(4)(a) and 8 N.Y.C.R.R. § 200.6(a)(2) for failing to provide paraprofessional services in accordance with I.B.'s IEP. RSUF ¶¶ 36, 45; Dkt. No. 143-12 at 5. The SED noted that the school did not submit documentation showing it informed CSE-10 about the paraprofessional absences. RSUF ¶ 40; Dkt. No. 143-12.

### III.    Harlem-2's Response to I.B.'s Behavior[2]

During the 2021–22 and 2022–23 school years, Harlem-2 issued approximately 40 suspension notices for I.B.'s conduct. RSUF ¶ 1. Each of the suspension notices was addressed to Blanco, signed by Cohen, and stated that I.B.'s behavior violated Harlem-2's Code of Conduct and "poses an ongoing threat of disruption to the academic process." *Id.* ¶ 2; Dkt. No. 143-7. The suspension notices also described the behavior triggering the suspension. *See* Dkt. No. 143-7. For example, according to the suspension notice, on December 7, 2021 I.B. "engaged in unsafe behavior by throwing classroom materials around the room." Dkt. No. 113-5. On March

---

[2] In response to Defendants' statement of undisputed facts, Plaintiff states that she lacks sufficient knowledge to admit or deny certain facts regarding I.B.'s behavior and the school's response. Plaintiff does not dispute that she had adequate opportunity to take discovery regarding those facts. Accordingly, the facts that are not disputed and that are supported by the record are deemed admitted. Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly . . . address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion"); *see Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 605 (S.D.N.Y. 2013).

4, 2022, I.B. engaged in unsafe behavior by running out of the classroom and by slapping a staff member in the face, putting his hands around the neck of a staff member, and scratching a staff member. Dkt. No. 113-6. On October 17, 2022, I.B. hit, kicked, and bit his paraprofessional, leaving a visible bruise on her arm, and flipped over his desk. Dkt. No. 143-7 at 34. Other notices reflect similar conduct by I.B. *See* Dkt. No. 143-7 (I.B.'s suspension notices, all but two noting an instance of throwing objects and/or hitting, pushing, kicking, or biting a staff member).

Though the total number of suspension days noticed was 183 days, RSUF ¶ 3, I.B. did not serve the vast majority of the suspensions due to determinations that his behavior was a manifestation of his disability. RSUF ¶¶ 4, 11, 21–22. I.B. ultimately served twenty-six suspension days in the 2021–22 school year and nine in the 2022–23 school year. *Id.*

At Blanco's request, and in response to I.B.'s behavior, school staff prepared and sent her detailed Daily Reports, from approximately March 2022 through May 2023, documenting I.B.'s behaviors throughout the school day. DSUF ¶ 19; Dkt. No. 113-1 at 151:17–153:7. Harlem-2 also provided regular counseling, implemented "feelings folders," maintained a calm-down box in I.B.'s classroom, and gave him regular walks and breaks. DSUF ¶ 35; RSUF ¶ 11; Dkt. No. 113-1 at 201. Cohen invited Blanco to observe I.B.'s classroom firsthand so she could see the behaviors and the accommodations. DSUF ¶ 32; Dkt. No. 113-74. Blanco declined the invitation. DSUF ¶ 33; Dkt. No. 113-74. I.B. was also placed in an Integrated Co-Teaching ("ICT") classroom, in which two teachers—a general-education teacher and a special-education teacher—share the classroom. DSUF ¶ 17; Dkt. Nos. 113-10, 113-17. When Blanco reported that I.B. was being bullied, Cohen immediately conducted an investigation and took steps to prevent further conflict between I.B. and the other student. DSUF ¶¶ 120–24; CSUF ¶¶ 120–24.

On January 9, 2023, Cohen contacted the Administration for Children's Services ("ACS") for additional support when she saw that I.B. was struggling at school and reported not receiving his ADHD medication at home. DSUF ¶ 20; CSUF ¶ 20; Dkt. No. 133-1 at 191–93. Blanco received a call from ACS stating that they had received a complaint. DSUF ¶ 25; CSUF ¶ 25; Dkt. No. 113-2 at 310–11. An ACS caseworker subsequently visited Blanco and I.B. at home on April 5, 2023. DSUF ¶ 27; CSUF ¶ 27.

### A.    Calls to Emergency Services

On eight occasions during the 2021–22 and 2022–23 school years, Harlem-2 contacted emergency services through 911 in response to I.B.'s conduct. RSUF ¶ 27. In addition, on several occasions I.B. was taken to the hospital by Blanco for psychiatric evaluation. RSUF ¶ 25.[3] The Court summarizes each instance where emergency services were called to the school below.

On April 25, 2022, Cohen called the police after I.B. ran out of the classroom, "kick[ed] and hit[] staff members," and threaten[ed] staff members." DSUF ¶ 75; CSUF ¶ 75; Dkt. No. 113-44. Blanco later took I.B. to Bellevue Hospital for evaluation. DSUF ¶ 76; CSUF ¶ 76. The Bellevue Hospital notes reflect that I.B. did not "exhibit any self-injurious behaviors or behavioral disturbances during evaluation," but that I.B. "verbalized in school that he wanted to hurt himself." DSUF ¶ 77; Dkt. No. 113-45.

On January 6, 2023, Harlem-2 staff called emergency medical services ("EMS") after I.B. had engaged in conduct that was unsafe to himself and others, including hitting a wooden block against the classroom's door's window and breaking it and pushing and throwing

---

[3] The parties dispute whether he was taken to the hospital at the demand of the school. RSUF ¶ 35 (Defendants objecting to characterization of "at the demand of Ms. Cohen or other [] staff.").

classroom objects at a staff member.  DSUF ¶¶ 79–80; CSUF ¶¶ 9–80.  Harlem-2's Mobile

Crisis Unit ("MCU")[4] indicated it was unable to assist and recommended calling EMS.  DSUF

¶¶ 79–80; CSUF ¶¶ 79–80.  Blanco declined EMS's care and brought I.B. home, but later

admitted that I.B. was exhibiting dangerous behavior and should be taken to the hospital.  DSUF

¶¶ 81, 83, 88; CSUF ¶¶ 81, 83, 88.

On January 30, 2023, I.B. engaged in unsafe behavior, including attempting to open a

third-story window and pointing scissors to his chest.  DSUF ¶ 89; CSUF ¶ 89.  Harlem-2's

Social Emotional Learning Specialist conducted a risk assessment and found that I.B. was at high

risk of hurting himself and a staff member contacted EMS.  DSUF ¶¶ 90–91; CSUF ¶¶ 90–91.

However, EMS did not come to the school.  DSUF ¶ 91; CSUF ¶ 91.

On February 17, 2023, I.B. climbed on top of a stair-railing, punched, hit, and kicked his

paraprofessional, the safety agent and Cohen and yelled "I wish you all will die," "I fucking hate

all of you," and "I want to kill you."  DSUF ¶ 92; CSUF ¶ 92.  The school safety agent, Steven

Straber, called EMS due to ongoing safety concerns, and police officers responded to the EMS

call.  DSUF ¶¶ 93–94; CSUF ¶¶ 93–94.  I.B. yelled at the responding officers and tried to kick

and punch an officer and reach for his taser.  DSUF ¶ 95; CSUF ¶ 95.  EMS arrived at the school

after the police officers and determined that I.B. should be taken to the hospital.  DSUF ¶ 96;

CSUF ¶ 96.  He was taken to Harlem Hospital without parental consent.  RSUF ¶ 31.  I.B. was

assessed for suicide risk and found to be at low risk.  RSUF ¶¶ 32–33; Dkt. No. 113-76 at 17.

On February 22, 2023, I.B. expressed the intent to harm himself by hitting his head

against a desk and trying to get through a third-story window while saying, "I'm tired of my

---

[4] A MCU is a group of behavioral health professionals, such as social workers, peer specialists and family peer advocates, who can provide care and short-term management for students who are experiencing a behavioral crisis.  DSUF ¶ 84.

life." DSUF ¶ 98; CSUF ¶ 98. I.B. also slapped Cohen and kicked and pushed the paraprofessional. DSUF ¶ 99; CSUF ¶ 99. Cohen called EMS due to I.B.'s continued physical aggression, but the EMS call was cancelled when I.B.'s father arrived at Harlem-2 and took I.B. home. DSUF ¶¶ 100–01; CSUF ¶¶ 100–01.

On April 2, 2023, I.B. punched, hit, and attempted to kick his paraprofessional, pushed Strauber, attempting to hit him with a chair, and told him "I wish you would die." DSUF ¶ 102; CSUF ¶ 102. A staff member called EMS. DSUF ¶ 103; CSUF ¶ 103. When police officers responded to the EMS call, I.B. began to hit and push an officer and kick his feet, tried to grab an officer's body camera, and continued to scream that he "wishes everyone would die" and called one of the officers an "idiot." DSUF ¶ 104; CSUF ¶ 104. EMS arrived and determined that I.B. should be taken to the hospital. DSUF ¶ 105; CSUF ¶ 105. Blanco testified that she refused to allow EMS to transport I.B. to the hospital and instead told EMS that she would transport him to the hospital, and she did so. Dkt. No. 113-2 at 117–118.

On April 13, 2023, I.B. hit, punched, and kicked his paraprofessional, threw a block at Cohen's head, and hit himself in the head and face and bit himself. DSUF ¶ 108; CSUF ¶ 108. In response to this behavior, a Harlem-2 staff member called EMS. DSUF ¶ 109; CSUF ¶ 109. I.B. pushed the EMS worker, threw a ball at him and flipped a gurney. DSUF ¶ 110; CSUF ¶ 110. EMS then determined that I.B. should go to the hospital for further evaluation, but Blanco did not consent and took I.B. home. DSUF ¶ 111; CSUF ¶ 111.

On April 24, 2023, I.B. was exhibiting physically aggressive behavior towards his paraprofessional and other staff members, resulting in visible bruises on one of their arms. DSUF ¶ 112; CSUF ¶ 112. A staff member called EMS, which determined that I.B. needed to be taken to the hospital for further evaluation. DUSF ¶ 113; CSUF ¶ 113. I.B. was transported to

8

the hospital by police and EMS without his parents' consent.  RSUF ¶ 31.  Blanco affirms that I.B. was again assessed and found to be at the lowest risk level for suicide.  PSUF ¶ 34; Dkt. No. 125-2 ¶ 7.[5]

Blanco testified that the repeated suspensions "felt very debilitating" and she would "get very upset" and "break down" upon receiving the notices  DSUF ¶ 129; CSUF ¶ 129; Dkt. No. 113-2 at 198, 200.  She further testified that after one of I.B.'s outbursts at Harlem-2, she went to urgent care because she "was having . . . an anxiety attack," DSUF ¶ 135; CSUF ¶ 135; Dkt. No. 113-2 302–304, and that she discussed the suspensions with her therapist, DUSF ¶ 136; CSUF ¶ 136; Dkt. No. 113-2 at 191–193, 303.

## PROCEDURAL HISTORY

Plaintiff initiated this case on behalf of herself and I.B. by complaint filed on February 27, 2023.  Dkt. No. 1.  She named five defendants as well as four John Doe Defendants.  *Id.*  In addition to Success Academy, Harlem-2 and Cohen, Plaintiff named as defendants Success Academy CEO Eva Moskowitz and Harlem-2 Vice Principal Carlos Alvarez.  *Id.*  Plaintiff asserted the following claims: (1) a violation of Section 504 of the Rehabilitation Act; (2) false imprisonment; (3) IIED; (4) abuse of process under the United States Constitution, New York State common law, and the New York Constitution; (5) municipal and supervisory liability; and (6) respondeat superior.  *Id.* ¶¶ 63–110.

On May 19, 2023, the named defendants filed a motion to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 29.  In

---

[5] Defendants lack knowledge to admit or deny this finding and note that no medical records from that date are in evidence.  RSUF ¶ 34.

response, Plaintiff filed her First Amended Complaint ("FAC") which named the same defendants and asserted the same claims.  Dkt. No. 35.[6]

The named defendants moved to dismiss the second through fifth claims of the FAC on June 23, 2023.  Dkt. No. 41.  The Court granted that motion by Opinion and Order of March 6, 2024.  Dkt. No. 54.  The Court dismissed Plaintiff's claims for false imprisonment, intentional infliction of emotional distress, abuse of process and municipal liability without prejudice and the remaining claims with prejudice.  *Id.*

Plaintiff filed the operative SAC on April 2, 2024.  Dkt. No. 55.  The SAC asserts only two claims for relief: (1) a claim for violation of Section 504 of the Rehabilitation Act asserted on behalf of I.B. against the Success Academy Defendants; and (2) a claim for IIED asserted by Plaintiff individually and on behalf of I.B. against Cohen.  *Id.* ¶¶ 70–89.[7]

Defendants filed this motion for summary judgment on December 17, 2025.  Dkt. No. 109.  Defendants also filed a memorandum of law in support of the motion, a Rule 56.1 statement, the declaration of Cohen, and the declaration of Ivy Xiaotian Yao, attaching exhibits. Dkt. Nos. 111–14, 116–17.  On January 19, 2026, Plaintiff filed a memorandum of law in opposition to the motion for summary judgment, a response to the Rule 56.1 statement, and the declaration of Leo Glickman.  Dkt. Nos. 125–27.[8]  On February 6, 2026, Defendants filed a reply memorandum of law in further support of their motion for summary judgment as well as a declaration of Cohen and the declaration of Yao attaching exhibits.  Dkt. Nos. 132–35.

---

[6] The Court dismissed the motion to dismiss the initial complaint as moot by order of June 20, 2023.  Dkt. No. 39.

[7] Plaintiff also alleges that Success Academy is liable for Cohen's tortious conduct under a theory of respondeat superior.  *Id.* ¶¶ 90–92.

[8] Plaintiff referenced exhibits in the declaration of Leo Glickman that were not filed on the docket.  Dkt. No. 127.  Plaintiff filed those exhibits with permission of the Court on May 11, 2026.  Dkt. No. 143.

**LEGAL STANDARD**

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). It may not rely on "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), or "on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). If "the party opposing summary

11

judgment propounds a reasonable conflicting interpretation of a material disputed fact,"

summary judgment shall be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9–10 (2d Cir.

1983).

## DISCUSSION

### I.    Intentional Infliction of Emotional Distress

Under New York law, an IIED claim requires proof of "(1) extreme and outrageous

conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional

distress; (3) a causal connection between the conduct and injury; and (4) severe emotional

distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999); *see also Howell v. New York

Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993) (recognizing the reckless-disregard formulation);

*LaNasa v. Stiene*, 2025 WL 893456, at *4 (2d Cir. Mar. 24, 2025) (summary order) (same).

Defendant argues that Plaintiff cannot establish any element of an IIED claim: Cohen's conduct

was not extreme or outrageous, she did not have the requisite intent, Plaintiff did not suffer

severe emotional distress, and Cohen's conduct did not cause Plaintiff's distress. Dkt. No. 111 at

1, 9–22.

### B.    Plaintiff Does Not Adduce Evidence of Extreme or Outrageous Conduct Intended to Cause Severe Emotional Distress.

The standard for establishing an IIED claim is "rigorous, and difficult to satisfy."

*Chanko v. Am. Broad. Cos. Inc.*, 49 N.E.3d 1171, 1179 (N.Y. 2016). The New York Court of

Appeals has never sustained an IIED claim. *Id.* (dismissing IIED claim and noting that every

such claim has failed before the court). "The conduct alleged must be 'so outrageous in

character, so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized society.'" *Blanco v. Success Acad.

Charter Schs., Inc.*, 722 F. Supp. 3d at 187, 217 (S.D.N.Y. 2024) (quoting *Martin v. Citibank,*

*N.A.*, 762 F.2d 212, 220 (2d Cir. 1985)); *accord Chanko*, 49 N.E.3d at 1179; *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 564–65 (S.D.N.Y. 2012) (conduct alleged must be "so extreme and outrageous that it transcends the bounds of decency").  IIED is a "highly disfavored [tort] under New York law" and "is to be invoked only as a last resort." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014).  "Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." *Zanfardino v. City of New York*, 230 F. Supp. 3d 325, 335 (S.D.N.Y. 2017) (quoting *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)).

"The tort of intentional infliction of emotional distress, no different than any other individual torts, is based on individual conduct," and "an individual cannot be held liable for conduct he or she did not commit or assist or agree upon and of which he [or] she was not aware." *Blanco*, 722 F. Supp.3d at 221.  "Conduct may be 'extreme and outrageous' where 'there is a deliberate and malicious campaign of harassment or intimidation.'" *Id.* at 217 (quoting *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122–23 (2d Cir. 2019)).  The tort of IIED "is as limitless as the human capacity for cruelty" and serves to "redress[] utterly reprehensible behavior." *Rich*, 939 F.3d at 122 (quoting *Howell*, 612 N.E.2d at 702).  However, "[a]cts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain an intentional infliction of emotional distress claim because such conduct is not sufficiently outrageous." *Blanco*, 722 F. Supp.3d  at 220 (quoting *Kinowski v. Home for Elderly Women of Montgomery Cnty., Inc.*, 2023 WL 4865531, at *13 (N.D.N.Y. July 31, 2023)).

At the motion to dismiss stage, the Court read the FAC to suggest that there existed a course of conduct that, in aggregate and if engaged in by a single individual, "could be

understood to be outrageous, extreme in degree, atrocious and utterly intolerable in a civilized society, at least to permit discovery to go forward." *Blanco*, 722 F. Supp. 3d at 217.  Accepting the allegations of the FAC and giving Plaintiff the benefit of every reasonable favorable inference, Defendants subjected I.B. to numerous unjustified and gratuitous suspensions over the course of a year, denied I.B. paraprofessional services that would have prevented his misconduct, called the authorities and caused him to be sent involuntarily to the hospital, "stood by without taking any action while other students at the school bullied I.B.," accused Blanco of not properly caring for I.B., and filed a false accusation with ACS in retaliation for her complaint to SED, and "did so all the while repeatedly making it clear to I.B. and to Blanco that I.B. was unwelcome at Harlem-2 and that the school was not a fit for him." *Id.* at 218.  The Court concluded: "Such gratuitous conduct, if engaged in by a single defendant or at the behest of a single defendant or together as concerted action, would be sufficiently egregious to plausibly plead a claim for intentional infliction of emotional distress and for discovery to go forward." *Id.*

Plaintiff's claim as it appears on the summary judgment record is alleged only against a single Defendant—Cohen—and on a more pared down record.  Drawing all inferences in favor of Plaintiff, it shows that over two school years, Cohen signed approximately 40 suspension notices for I.B., the vast majority of which were never enforced; that, while emergency services were called in connection with I.B. eight times, Cohen was personally involved in only two of those calls; I.B.'s IEP-mandated paraprofessional was absent on 11 documented occasions during one semester; and Cohen made a referral to ACS that Blanco experienced as intrusive. There is no evidence that Cohen took action to intentionally cause emotional distress for either I.B. or for Blanco.  Cohen's conduct is insufficient to constitute extreme and outrageous conduct

14

inflicted with intent to cause, or disregard of a substantial probability of causing, severe emotional distress.

### 1.    The Suspension Notices and Calls to EMS

Plaintiff first argues that Cohen's conduct in issuing the suspension notices and contacting EMS constitutes extreme and outrageous conduct as a matter of law.  Plaintiff fails to offer evidence to create a triable issue of fact.

To be sure, the "extreme and outrageous character of the conduct may arise from an abuse by the actor of a position."  Restatement (Second) of Torts § 46 (1965), cmt. e.  Thus, "police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse of their position."  *Id.*  Similarly, where the actor knows a person "is peculiarly susceptible to emotional distress," that actor's conduct may become "heartless, flagrant, and outrageous" even where it would not otherwise be so characterized.  *Id.* cmt. f.

At the same time, however, "major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough."  *Id.*  Moreover, the school's conduct must be judged against the network of laws that set forth the expectations of society for school officials in the charge of students under their care including students who are disabled.  Absent evidence of the gratuitous infliction of harm, the tort of intentional infliction of emotional distress does not prohibit what the common or statutory law otherwise permits and encourages.  *See Howell*, 81 N.Y.2d at 125–26 (recognizing New York's privileged-conduct limitation on IIED liability and explaining that the exercise of a legal right cannot, "however distressing," by itself support IIED); *Cohen v. G&M Realty L.P.*, 2017 WL 1208416, at *5 (E.D.N.Y. Mar. 31, 2017) (dismissing an IIED claim where Defendants destroyed property but "did no more than raze what they rightfully owned" (citing Restatement (Second) of Torts § 46 cmt. g)); Restatement (Second) of Torts § 46 cmt. g (1965) ("The actor is

15

never liable . . . where he has done no more than insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." )

A school entrusted with the care of students in kindergarten or first grade, or any minor students for that matter, assumes a position of responsibility to its students.  School authorities must "adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision."  *Mirand v. City of New York*, 637 N.E.2d 263, 266 (N.Y. 1994).  They must "exercise such care as a parent of ordinary prudence would observe in comparable circumstances."  *Id.* (quoting *Hoose v. Drumm*, 22 N.E.2d 233, 234 (N.Y. 1939)).  The duty extends to protecting a student from the harmful conduct of a third party, including another student.  *See Pratt v. Robinson*, 349 N.E.2d 849, 852 (N.Y. 1976) (schools owe a "special duty" to students that requires "a school to act when a child, while in its charge, is threatened by the negligence of a third party, and it must make reasonable efforts to anticipate such threats."); *Murray v. Nazareth Reg'l High Sch.*, 579 F. Supp. 3d 383, 388 (E.D.N.Y. 2021) (noting same); *Vega v. Fox*, 457 F. Supp. 2d 172, 184 (S.D.N.Y. 2006) ("New York courts have found that "[s]chools have a duty to provide supervision to ensure the safety of those students in their charge and are liable for foreseeable injuries proximately caused by the absence of adequate supervision." (quoting *Siller v. Mahopac Cent. Sch Dist.*, 795 N.Y.S.2d 605, 605 (2d Dep't 2005))); *see Lawes v. Bd. of Educ. of City of New York*, 213 N.E.2d 667, 668 (N.Y. 1965) (a school has responsibility to "take energetic steps to intervene at other times if dangerous play comes to its notice while children are within its area of responsibility.").

In addition, New York Education Law § 3214 specifically authorizes schools to suspend students who are insubordinate, disorderly, violent, disruptive, or whose conduct endangers the

safety, morals, health, or welfare of others.  N.Y. Educ. Law § 3214(3)(a).[9]  That authority

extends, with limited exceptions, to students who are disabled or are presumed to be disabled.

Under federal law, which is followed by New York law, "[a] school can remove a child with a

disability from their regular placement for up to 10 school days at a time, even over the parents'

objections, whenever discipline is appropriate and is administered consistent with the treatment

of non-disabled children."  2 R Schneider, Education Law § 6:14 (2025).  After a student serves

ten days of suspension within a school year, prior to each subsequent suspension, a manifestation

determination review ("MDR") must be conducted by a manifestation team, comprised of a

representative of the school district, a parent, and relevant members of the CSE, before the

student is suspended or removed from his or her current educational placement for violation of

school rules.  *Id.*; N.Y. Educ. Law § 3214(g)(1); 20 U.S.C. § 1415(k)(1)(B)–(C).  If the

manifestation team determines that the student's behavior is a manifestation of the student's

disability, the school may not suspend or remove the student from his or her current educational

placement for a violation of school rules.  N.Y. Educ. Law § 3214(g)(3)(viii).  However, "upon a

determination by a manifestation team that the behavior of a student with a disability was not a

manifestation of the student's disability, such student may be disciplined . . . in the same manner

and for the same duration as a nondisabled student."  *Id.* § 3214(g)(3)(vi).

Likewise, a school has the authority to contact emergency medical services or law

enforcement when it believes that the conduct of a student is dangerous to himself or others.  *See*

*Suraci by & through Suraci v. Hamden Bd. of Educ.*, 2019 WL 161501 (D. Conn. Jan. 10, 2019)

---

[9] Each suspension may last for a period of no more than five school days.  *Id.* § 3214(3)(b)(1).  If
the school seeks to impose a suspension for a period longer than five school days, the pupil and
his or her parent must be given an opportunity for a fair hearing.  *Id.* § 3214(c)(1).  At the fair
hearing, the pupil and his or her parent have right to representation by counsel, to question
witnesses against the pupil, and to present witnesses on his or her behalf.  *Id.* § 3214(c)(1).

(applying Connecticut law and dismissing IIED claim where school official summoned ambulance to transport student involuntarily to psychiatric hospital despite knowing the student had traumatic associations with ambulances and that the transport would cause "great distress"); *McCarthy v. Roosevelt Union Free Sch. Dist.*, 2017 WL 4155334 at \*4 n.6 (E.D.N.Y. Sept. 19, 2017) (Bianco, J.) ("no rational juror could find" extreme or outrageous conduct when the school called police who hospitalized teacher against her will after the teacher stated "Oh, I feel like killing myself"); *N.U. by Amar v. E. Islip Union Free Sch. Dist.*, 2020 WL 7024309, at \*3–6, \*12 (E.D.N.Y. Nov. 30, 2020) (granting summary judgment on IIED where school staff searched student, yelled at student, issued suspension, and called 911 after student told kids in the cafeteria that he was a terrorist and was going to bomb the school). As a general matter, the common law permits a civilian to seek police assistance or to furnish information to law enforcement authorities "who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed" without exposing themselves to civil liability should their judgment to ask for police assistance turn out to be misguided. *Savarese v. City of New York*, 547 F. Supp. 3d 305, 340–41 (S.D.N.Y. 2021) (quoting *Delince v. City of New York*, 2011 WL 666347, at \*4 (S.D.N.Y. Feb. 7, 2011)); *accord Gilman v. Marsh & McLennan Cos., Inc.*, 868 F.Supp.2d 118, 128 (S.D.N.Y. 2012); *Johnson v. Follett Higher Educ. Grp., Inc.*, 979 N.Y.S.2d 393, 394 (2d Dep't 2014); *Blanco*, 722 F. Supp. 3d at 210.

Measured against these standards, Cohen's conduct, even viewed favorably to Plaintiff, does not exceed the bounds of what is expected in civilized society and cannot sustain a claim for IIED.

The evidence, construed favorably to Plaintiff, establishes no more than that the school issued suspension notices and called emergency services in accordance with applicable laws

when it believed such action was warranted to ensure the safety of the student or others in the school. *See Suraci ex rel. Suraci*, 2019 WL 161501, at *2–3 (dismissing IIED claim where school official "[t]ook action to ensure school safety under the circumstances as she understood them to be"); *see also Morales v. United States*, 2023 WL 2129580, at *8 (E.D.N.Y. Feb. 17, 2023) (no IIED where Defendants "carried out their duties per routine procedure" and "did not do anything out of the ordinary"); *Lydeatte v. Bronx Overall Econ. Dev. Corp.*, 2001 WL 180055, at *2 (S.D.N.Y. Feb. 22, 2001) (acts amounting to "harassment, disrespectful or disparate treatment, [or] hostile environment" are "not sufficiently outrageous"); *cf. Doe v. Hill Sch.*, 2023 WL 5339610, at *7 (E.D. Pa. Aug. 18, 2023) (contrasting wide discretion given to schools to engage in standard discipline with unjustified harassment, debasement, or humiliation by school officials that may amount to IIED). Plaintiff does not contend that any specific suspension or call to EMS was sufficiently extreme and outrageous to give rise to a claim for IIED but argues that Cohen's conduct, in issuing suspensions, became outrageous by its repetition. Dkt. No. 125 at 1, 16. But it is not disputed that I.B.'s conduct was repetitive. Each suspension notice was issued after an event where I.B. engaged in conduct that was disruptive and violated school rules. Almost all of I.B.'s suspension notices describe an instance of throwing objects and/or hitting, pushing, kicking, or biting a staff member. *See* Dkt. No. 143-7. On occasion, I.B.'s outbursts left visible signs of injury on staff members. Dkt. No. 143-7 at 34 (I.B. bit his paraprofessional, leaving a visible bruise on her arm). The only two notices that did not involve physical aggression were issued after I.B. ran out of the classroom and hid from staff, *id.* at 11, and ran from school staff, climbed on classroom materials, and screamed in class, *id.* at 13. In each notice, the school determined that I.B. violated the school's Code of Conduct

19

and posed an ongoing threat of disruption to the academic program as required by New York law. *Id.*; Dkt. Nos. 113-5, 113-6; N.Y. Educ. L. § 3214(g)(3)(viii).

The number of suspensions alone cannot give rise to a claim for IIED. I.B. was not entitled to a free pass for future violations of the school Code of Conduct because he engaged in conduct that violated Harlem-2's Code of Conduct in the past. New York law specifically contemplates the circumstance in which a student with a disability repeatedly engages in misconduct warranting suspension, *see* N.Y. Educ. L. § 3214(g)(3)(viii); 20 U.S.C. § 1415(k)(1)(E), and requires that for each such instance the school will issue a suspension notice to the parent, N.Y. Educ. L. § 3214(3)(a). The suspension notice imposed on a disabled student does not itself require the student to miss any school. Neither the content of the notice nor the fact of its issuance need even be given to the student. As in the case of I.B., after the student has already served ten days of suspension a year, the sole function of the suspension notice is to set up a MDR and, if the MDR determines that the conduct was *not* a manifestation of the disability, to permit the school to impose the suspension. 20 U.S.C. § 1415(k)(1)(C). It is the result of the MDR itself, and not the suspension notice alone, that requires a student to miss school. Even then, the school is required to provide educational services to enable the child to participate in the curriculum in a different setting. *Id.* § 1415(k)(1)(D).

Thus, Plaintiff's reference to the 39 suspensions is misleading. Cohen's conduct in issuing suspension notices to I.B. was not conduct that was "utterly intolerable in a civilized society."" *Blanco*, 722 F. Supp. 3d at 217. It is conduct that civilized society specifically sanctions. There is no evidence that Harlem-2 violated New York or federal education law. Nor is there evidence that the notices were issued gratuitously, discriminatorily or on the basis of exaggerated allegations. *Cf. Biswas v. City of New York*, 973 F. Supp. 2d 504, 513, 536

20

(S.D.N.Y. 2013) (school officials' conduct in fabricating evidence to be used against plaintiff in an attempt to secure criminal prosecution and school suspension sufficient to state IIED claim). Indeed, after the IEP process began, Harlem-2 reduced I.B.'s suspension even when the behavior was not the manifestation of his disability.  *See* DSUF ¶ 60; CSUF ¶ 60; Dkt. No. 113-41. Moreover, each of the suspension notices was issued to Blanco and not to I.B.; I.B. himself had no need to know of the notices unless the MDR concluded his behavior was not a manifestation of his disability.  It is only because Blanco chose to share the suspension notices with I.B.—and not because of any conduct by the school or Cohen—that I.B. was aware of them.  And, after the first 10 days of suspension a year, none of the suspension notices themselves required I.B. to miss any school.  The notices were sent to communicate what had happened at the school, create a record of the suspension, and communicate information regarding I.B.'s rights as a student with a disability.  DSUF ¶ 54; *see* Dkt. No. 143-7.  Their issuance was not intolerable.

Cohen's conduct in contacting EMS likewise cannot be considered extreme and outrageous or intolerable in civilized society.  In the first instance, the record does not support that Cohen herself made the decision to contact EMS on any more than two occasions: once on April 25, 2022 and once on February 22, 2023.  Dkt. No. 126 ¶¶ 75, 100.  Construed favorably to Plaintiff, the record shows that the authority to contact emergency services resided with the school safety officer, Straber, and only in his absence did the authority rest with the senior leader at the school, whom he identified to be Cohen.  Dkt. No. 143-2 at 26.  Straber, however, did not report to Cohen.  He was employed by Success Academy, not Harlem-2 specifically, and worked as the safety associate for all of Success Academy's schools in northern Manhattan.  *Id.* at 7–8. On the instances where he contacted emergency services, he would consult the school's principal and then make the decision whether to call 911.  *Id.* at 26.  There is no evidence that, on issues of

21

safety, which was within his charge, he would nonetheless defer to the school principal. And there is evidence that staff members other than Cohen frequently called 911 when I.B. was in crisis. *See* Dkt. No. 113-18 at 4 (MCU recommended call to EMS); Dkt. No. 113-61 (Business Operations Manager called EMS); Dkt. No. 113-65 (same); Dkt. No. 113-68 (same). Cohen denied calling emergency services more than twice and there is no documentary or testimonial evidence that she did call emergency services for I.B. other than on those two occasions.

Even if Cohen contacted emergency services, such conduct would not be so egregious or outside the bounds of what is tolerable in civilized society to support a claim for IIED. On each of the occasions where EMS was called, it is undisputed that I.B. threatened to hurt, or began physically attacking, himself or others. *See* DSUF ¶¶ 92–109; CSUF ¶¶ 92–109. A school is not powerless to take action when a child under its care engages in conduct that the school reasonably believes poses a threat to the child or to others. To the contrary, a school is affirmatively obligated to take action to protect its students. "Teachers and school administrators have multiple responsibilities: teaching, maintaining order, and protecting troubled and neglected students. They are part disciplinarian, and part protector." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 273 (2d Cir. 2011). The school had an affirmative obligation to ensure that I.B. not harm himself or another student; it must take steps "reasonably calculated to protect [students] from danger" where it is "on notice of imminent danger." *Mirand*, 637 N.E.2d at 267; *see id.* at 50 (affirming jury verdict finding school negligent where student was attacked by another student and staff failed to protect student). This obligation similarly applies where a student poses a threat of danger to him or herself. *Cf. Piechowicz v. Lancaster Cent. Sch. Dist.*, 2022 WL 17540648, at *4 (W.D.N.Y. Dec. 8, 2022) (substantive due process claim following student death required plaintiff to allege that "school officials knew or should have known that

22

[the student] was *at risk of suicide* because of [the school's] conduct" (emphasis in original)).  In other words, Cohen had an obligation to respond to I.B.'s behavior, both to ensure his safety and the safety of other students.  Acting in furtherance of this obligation, even if imperfectly, does not violate the rules of a civilized society or render Cohen's conduct outrageous.

Plaintiff asserts that the decision to intervene by calling 911, rather than use other de-escalation techniques and exhausting alternatives, rendered the conduct extreme and outrageous.  Dkt. No. 125 at 13–14, 20–21, 28; *see also* Dkt. No. 100-1 (expert report of Dr. Norris-Brilliant).[10]  Plaintiff relies on the expert opinion of Dr. Norris-Brilliant, who opined that the school "should have done basic research and training on techniques" rather than "simply talking to [I.B.] or telling him to utilize deep breathing."  Dkt. No. 125 at 21 (quoting report).  As an initial matter, the opinion of an expert cannot alone define the bare minimum of what is acceptable in a civilized society.  That is defined by the norms and rules of society and not by what a hired expert might say is best practice.  *See Townsend v. Ganci*, 566 B.R. 129, 135 (E.D.N.Y. 2017), *aff'd sub nom. In re Townsend*, 726 F. App'x 91 (2d Cir. 2018) (summary order) (describing "bounds of decency as measured by what the average member of the community would tolerate").  That an expert in psychology could conceive of an improved method for addressing a child's disruptive behaviors thus does not render Cohen's actions outrageous.  The tort of IIED does not serve to promote best practices; its role is to provide redress for "utterly reprehensible behavior."  *Rich*, 939 F.3d at 122; *see Carone v. Mascolo*, 573 F. Supp. 2d 575, 599 (D. Conn. 2008) (granting summary judgment as to IIED claim where

---

[10] Defendants moved to exclude the expert report of Dr. Norris-Brilliant pursuant to Federal Rules of Evidence 401–403 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Dkt. No. 99.  The motion is moot.  Even considering the expert report, Plaintiff has failed to raise a genuine issue of material fact.

"disciplinary measures taken against [plaintiff] cannot be characterized as humiliating, extreme or outrageous"); *Fahmy v. Duane Reade, Inc.*, 2005 WL 2338711, at *8 (S.D.N.Y. Sept. 26, 2005) (disciplinary employment action is insufficient for an IIED claim, "even when coupled by verbal harassment" and "obviously improper").

In any event, the evidence does not support Plaintiff's contention that Cohen relied on emergency services as a first resort. *See, e.g.,* Dkt. No. 113-68 (EMS called after staff member utilized calming techniques that had been effective earlier that day but I.B. persisted in punching staff members); Dkt. No. 113-55 (EMS called after staff member "tried to give [I.B.] encouragement, and console [I.B.] to go back to class, but [I.B.] became more upset and distressed"). Further, there is no evidence that when emergency services arrived, they regularly handcuffed I.B., used force or restraint, or engaged in any egregious conduct. *See* Dkt. No. 113-55 (noting when I.B. got upset and reached for an officer's taser, the officers left the room for him to calm down before returning to ask "questions about what he likes to do and what game he likes to play"). *Cf. Mejia v. City of New York*, 119 F. Supp. 2d 232, 285–86 (E.D.N.Y. 2000) (officers' conduct in fabricating evidence, using ethnic slurs, and ordering a strip search was sufficiently extreme and outrageous to state a claim for IIED).

Plaintiff additionally asserts that Cohen's conduct in calling emergency services was extreme and outrageous because emergency services took I.B. to the hospital without his parent's consent. That too does not make her conduct extreme and outrageous. To be sure, parents have protectable liberty interests "in the care, custody, and control of their children." *Singh v. Sachem Cent. Sch. Dist.*, 2025 WL 1616622, at *21 (E.D.N.Y. June 6, 2025) (quoting *Toxel v. Granville*, 530 U.S. 57, 65–67 (2000)). But those interests are not unqualified. When a parent entrusts his or her child to a school, the school assumes responsibility for the child's care. A school cannot

24

simply ignore the needs of a kindergartner in distress.  It may be required to take action.  *See Tenebaum v. Williams*, 193 F.3d 581, 594 (2d Cir. 1999) (where "the child is immediately threatened with harm" removal of a child from school, absent parental consent, may be justified); *cf. MC v. Arlington Cent. Sch. Dist.*, No. 11-CV-1835, 2012 WL 3020087, at *5–6 (S.D.N.Y. July 24, 2012) (concluding that defendants, including school district, school board, and teachers, did not violate the Fourteenth Amendment by "taking a student who was not, and had never been, suicidal and sending him to hospital, where a psychiatric record was taken" (internal quotation marks and citation omitted)).

There is no evidence that Cohen engaged in conduct other than what would be expected in civilized society.  She did not herself ever direct that I.B. be taken to the hospital.  On both occasions where I.B. was transported to the hospital absent parental consent, the evidence is undisputed that it was the EMS workers who determined that hospital care was necessary.  Dkt. No. 113-55 at 3; Dkt. No. 113-68 at 6.  And leaving aside that Cohen cannot be held liable in IIED for acts she did not take, there is no evidence that the EMS workers themselves acted outside the bounds of what is expected in civilized society.  Under New York's Mental Hygiene Law, "any peace officer . . . or police officer . . . may take into custody any person who appears to be mentally ill and is conducting themselves in a manner which is likely to result in serious harm to the person or others."  N.Y. Ment. Hyg. L. § 9.41(a); *see* N.Y. Crim. Pro. § 2.10(41) (emergency rescue and first aid squad considered peace officers when on duty).  It was not outrageous or extreme for the EMS workers to conclude that I.B. was engaged in conduct that could result in serious harm to him nor was it outrageous or extreme for Cohen to decide not to intervene or prevent EMS workers from taking the action they deemed to be necessary.  *See Patrick v. Success Acad. Charter Schs., Inc.*, 354 F. Supp. 3d 185, 207 (E.D.N.Y. 2018)

25

("[L]iability will not attach to a defendant who furnishes information to law enforcement authorities who are then free to exercise their own judgment as to whether [a seizure] should be made." (quoting *Camac v. Long Beach City Sch. Dist.*, 2011 WL 3030345, at *8 (E.D.N.Y. July 22, 2011))).

There is no evidence that Cohen acted with the "intent to cause, or disregard of a substantial probability of causing, severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999); *see also Howell*, 81 N.Y.2d at 121. Plaintiff argues that "[a]ny reasonable person would infer" that repeatedly suspending a young disabled child would cause severe distress and that Cohen therefore acted with reckless disregard of the substantial probability of causing severe distress. Dkt. No. 125 at 11. "[K]nowledge of a plaintiff's susceptibility to emotional distress can, under New York law, transform non-actionable acts into outrageous conduct." *Rich*, 939 F.3d at 124. However, even where a plaintiff is especially vulnerable or susceptible to distress, "major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough." Restatement (Second) of Torts § 46 (1965), cmt. f. Thus, "the courts that have found that a defendant's knowledge of a plaintiff's particular susceptibility converts potentially non-actionable conduct into actionable conduct have done so in the context of much more substantial and egregious conduct than what has been alleged here." *Lally v. Klick USA, Inc.*, 2025 WL 786576, at *6 (S.D.N.Y. Mar. 11, 2025). Here, the school was not required to ignore I.B.'s obvious need for help for fear that calling for such help would cause I.B. distress. Nor could I.B.'s diagnosis and resultant vulnerability inherently render Cohen's conduct outrageous. Cohen was permitted to take action to address I.B.'s admitted conduct. *See McGrath v. White*, 208 N.Y.S.3d 805 (Table), at *13–14 (N.Y. Sup. Ct. 2023) (psychiatrist's conduct in yelling at a

26

patient, including the use of expletives and calling her a "junkie," in the addiction recovery center of a hospital was not sufficiently outrageous to state claim for IIED, despite awareness of patient's vulnerability by virtue of her visiting the center); *see also Lally,* 2025 WL 786576, at *2, 6 (granting summary judgment as to IIED claim where defendant knew plaintiff's disability caused severe reactions to stress but terminated her while she was on leave to attend to her disability).[11]

### 2.    The Referral to ACS

Cohen also cannot be held personally liable for IIED based on her referral to ACS.

New York law imposes an affirmative obligation on school officials, including teachers, guidance counselors, and administrators, to make a report to the Office of Children and Family Services ("OCFS") whenever they suspect a child is abused or maltreated.  N.Y. Soc. Serv. Law § 413(1)(a), (b).  ACS investigates reports made to OCFS.  18 N.Y.C.R.R. § 432.2(b)(1).  The statutory scheme encourages reports.  It presumes good faith, and provides immunity from civil and criminal liability when a person makes a report unless he or she engages in willful misconduct or gross negligence.  N.Y. Soc. Serv. Law § 419.  It also imposes civil and criminal penalties on any person, official, or institution who is under obligation to report suspected child abuse or maltreatment and who willfully fails to do so.  *Id.* § 420; *see also Cox*, 654 F.3d at 273

---

[11] The cases finding outrageous conduct based, in part, on the plaintiff's susceptibility to distress also stem from circumstances where defendants had specific knowledge of the plaintiff's susceptibility to emotional distress and their conduct exacerbated that distress.  *See Rich*, 939 F.3d at 124 (defendants manipulated grieving family into working with them by appealing to their desire for closure and then used that relationship to promote a conspiracy theory that the family said was "severely hurting them"); *Schafer v. Hicksville Union Free Sch. Dist.*, 2011 WL 1322903, at *15 (E.D.N.Y. Mar. 31, 2011) (denying summary judgment as to IIED claim where evidence shows that Defendant confined a disabled child with a seizure disorder and claustrophobia in a "time out room," which was a small room whose only window was blocked). Plaintiff has adduced no similar evidence here.

("The state's interest in encouraging teachers to protect students is so powerful that New York confers immunity from civil and criminal liability whenever they report suspected abuse in good faith, and it exposes them to criminal and civil liability whenever they willfully fail to do so." (citing N.Y. Soc. Serv. Law §§ 419–20)).  Moreover, the reporting obligation is not "predicated upon actual or conclusive proof of abuse or maltreatment"; a reporter need not wait until it is clear that a child is in need of help.  *See Rine v. Chase*, 765 N.Y.S.2d 648 (2d Dep't 2003); *see also Goldberg v. Edson*, 838 N.Y.S.2d 145, 146 (2d Dep't 2007).  The conduct becomes tortious only when there is evidence of willful misconduct, gross negligence, actual malice, ill will, or retaliation.  *See Stratakis v. Ferncliff Manor Home for the Handicapped*, 764 N.Y.S.2d 431, 432 (1st Dep't 2003) (affirming denial of summary judgment where allegations that employees filed "baseless charges" in retaliation was "based on more than mere surmise"); *Hachmann v. Cnty. of Nassau*, 818 N.Y.S.2d 102, 103–04 (2d Dep't 2006) (affirming denial of summary judgment where plaintiffs sufficiently raised an issue of fact as to malice by presenting evidence that CPS complaint followed parent's statement that he would file complaint regarding school and principal told parent, in explaining his call to CPS, "I can do anything I want to").

Cohen's conduct did not fall outside the bounds of what would have been expected of her as school principal.  She reached out to ACS when she saw that I.B. was struggling at school, and was not being given his medication by his parents, and believed additional help was needed to support I.B.  DSUF ¶ 20.  Cohen gave the uncontradicted testimony that she explained to the ACS caseworker that "I.B. was struggling behaviorally and academically" and that from her perspective, it appeared that "I.B. was not consistently taking his medication he was prescribed and it was adversely impacting his ability to be successful in school."  Dkt. No. 113-1 at 191–192.  Prior to contacting ACS, Cohen relayed to Blanco that I.B. once told the school that he did

not take his medication because Blanco had refused to give it to him and that he had previously gotten "in trouble" with Blanco for informing the school that he had not taken his medication. DSUF ¶ 21; CSUF ¶ 21. The school had offered to have the school nurse give I.B. his medication but Blanco refused to provide consent. DSUF ¶ 23; CSUF ¶ 23. There is no evidence that Cohen fabricated allegations regarding I.B.'s medication, knew the referral to be baseless, disregarded contrary information that would have made the referral obviously unjustified, or contacted ACS to punish Blanco or I.B. *Cf. Kiraka v. Success Acad. Charter Sch.*, 2026 WL 890621, at *15 (S.D.N.Y. Mar. 31, 2026) (noting that malicious or reckless false reporting of child mistreatment could constitute egregious conduct for an IIED claim"); *see also Walston v. City of New York*, 2024 WL 1376905, at *2 (S.D.N.Y. Mar. 7, 2024), *report and recommendation adopted*, 2024 WL 1374837 (S.D.N.Y. Apr. 1, 2024) (false report that Plaintiff was "erratic" and "defiant," resulting in loss of custody of newborn child would amount to willful misconduct or gross negligence); *Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 382 (E.D.N.Y. 2011) (evidence that defendants ignored exculpatory information when filing OCFS complaint raised a triable issue as to whether they acted with gross negligence). Plaintiff also admits that no one from ACS told her that the complaint was baseless or pretextual. Dkt. No. 132 ¶ 26.

At most, the record shows that ACS's involvement was unwelcome, intrusive, and distressing. That is not enough to state a claim for IIED. An unfounded or non-adverse outcome does not retroactively make the referral outrageous, and the distress inherent in a child-welfare inquiry does not transform good-faith use of a protective mechanism into conduct beyond all possible bounds of decency.

29

### 3.    The Paraprofessional Lapses

Plaintiff next relies on lapses in I.B.'s paraprofessional support.  In December 2022, SED found that both Harlem-2 and CSE-10 were "in violation" of Education Law § 2853(4)(a) and 8 N.Y.C.R.R. § 200.6(a)(2) for failing to provide paraprofessional services in accordance with I.B.'s IEP, including 11 days without coverage and a failure to provide coverage during lunch and recess.  Dkt. No. 132 ¶¶ 36–38, 45; Dkt. No. 127-10 at 5.

New York courts have held that the failure to provide an appropriate IEP does not itself give rise to a claim for IIED.  *See Y.D. v. N.Y.C. City Dep't of Educ.*, 2016 WL 698139, at *8 (S.D.N.Y. Feb. 19, 2016) (allegation that Defendant failed to provide an appropriate IEP is insufficient to state a claim for IIED); *Jenn-Ching Luo v. Baldwin Union Free Sch. Dist.*, 2011 WL 941263, at *8 (E.D.N.Y. Mar. 15, 2011), *aff'd*, 556 F. App'x 1 (2d Cir. 2013) (summary order) (holding that alleged conduct that could be summarized as conspiring to "shortchange" an autistic student's IEP was not sufficiently extreme or outrageous to state a claim for IIED).  Special-education law supplies its own framework for assessing failures to implement an IEP, including whether the failure was material or substantial.  *See D.D-S. v. Southold Union Free Sch. Dist.*, 2011 WL 3919040, at *13 (E.D.N.Y. Sept. 2, 2011), *aff'd*, 506 F. App'x 80 (2d Cir. 2012) (summary order).  IIED requires something more than even a serious lapse in educational services.  *Cf. Scaggs v. N.Y. Dep't of Educ.*, 2007 WL 1456221, at *1, (E.D.N.Y. May 16, 2007) (declining to dismiss IIED claim where plaintiffs alleged failure to provide necessary educational services "combined with the allegedly decrepit condition of the school's physical facilities," including failure to provide for safe transportation, rodent extermination, certified teachers, or basic school supplies, despite repeated complaints).

Plaintiff identifies no evidence from which a reasonable jury could find that Cohen intentionally withheld paraprofessional support to cause I.B. or Blanco emotional distress.  Some

paraprofessionals quit after I.B. became physically aggressive toward them.  Dkt. No. 116 ¶ 44.

When absences occurred, school staff stepped in and communicated with the agency and CSE to

request substitutes.  DSUF ¶¶ 41, 46–50.  Though Plaintiff disputes the consistency and

adequacy of these efforts, CSUF ¶¶ 41, 46, 50, it is undisputed that the school made some efforts

to address the lapse.  As to Cohen, Plaintiff does not identify evidence that Cohen caused the

lapses, refused available coverage, or withheld services to punish or torment I.B. or Blanco.  The

SED finding may establish a serious service-delivery violation; it does not establish that Cohen

acted with the intent or reckless disregard required for IIED.

### 4.    Conduct in the Totality

"Under New York law, the proper inquiry is not merely whether an individual act might

be outrageous, but whether the action in its totality amounted to a deliberate and malicious

campaign."  *Blanco*, 722 F.3d at 217; *accord Rich*, 939 F.3d at 123.

Cohen's conduct as a whole, construed favorably to Plaintiff, reflects repeated use of

disciplinary procedures, repeated resort to emergency responders, service-delivery lapses, and a

social-services referral, all in connection with a student whose disability produced challenging

and at times dangerous behavior.  The repetition of disciplinary action that causes emotional

harm, however, cannot alone establish a claim for IIED when each instance of disciplinary action

occurred in response to misconduct.  A school is not barred from reacting to new misconduct of a

child because it has been forced to take action in response to prior misconduct.

School principals and schoolteachers have to make difficult judgments.  A decision that

benefits the student body as a whole might injure an individual student; a decision that benefits

an individual student might risk harm to the student body.  *See N.U. by Amar*, 2020 WL

7024309, at *6 (E.D.N.Y. Nov. 30, 2020) (granting summary judgment to defendant on IIED

claim where school searched student and suspended him following student's statement in the

31

cafeteria that he was a terrorist and would bomb the school, even though student alleged statement was in response to bullying).  The courts may second guess those decisions if there is evidence that they are not taken in good faith but rather are part of a campaign to cause gratuitous harm.  *Blanco*, 722 F. Supp. 3d at 218 (noting that "gratuitous" suspensions, along with denying I.B. paraprofessional services and retaliating for filing a complaint, with the intention of making I.B. feel unwelcome, could constitute egregious conduct); *Biswas*, 973 F. Supp. 2d at 513, 536 (permitting IIED claim to proceed where plaintiff alleged that school officials fabricated evidence for school suspension); *Lawton v. Success Acad. Charter Schs., Inc.*, 323 F. Supp. 3d 353, 366 (E.D.N.Y. 2018) (allegations of frequent suspensions and calls to the police support allegation of bad faith or gross misjudgment where school had "Got to Go" list targeting disabled students for removal).  But there is no such evidence here of any conduct taken to inflict gratuitous harm or other than in good faith.  No reasonable jury could find that Cohen's conduct exceeded that which would be expected in civilized society and was so extreme and outrageous to give rise to tort liability.

### C.    Severe Emotional Distress

Absent evidence creating a triable issue as to whether Cohen engaged in outrageous conduct, Plaintiff's claim for IIED fails as a matter of law.  The Court additionally finds, however, that Plaintiff fails to adduce evidence that would permit a reasonable jury to find that either Blanco or I.B. suffered severe emotional distress.

There is a division of authority in the New York courts whether a plaintiff seeking to establish "severe emotional distress" for IIED purposes is required to provide objective medical evidence supporting the claim.  The majority of courts have said that such evidence is required. *See, e.g., Samtani v. Cherukuri*, 2015 WL 64671, at *15 (E.D.N.Y. Jan. 5, 2015) ("The overwhelming weight of authority . . . favors a requirement of objective medical evidence

separate and apart from a Plaintiff's self-serving testimony."); *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996); *Benn v. City of New York*, 2021 WL 3193022, at *6 (S.D.N.Y. 2021); *Allam v. Meyers*, 906 F. Supp. 2d 274, 282–83 (S.D.N.Y. 2012). A minority of courts have rejected such a categorical rule and stated that, at least in some circumstances, medical evidence is not necessary. *See Fellows v. Rosati*, 97 N.Y.S.3d 926 (4th Dep't 2019); *Zane v. Corbett*, 919 N.Y.S.2d 625 (4th Dep't. 2011); *Plunkett v. N.Y.U. Downtown Hosp.*, 801 N.Y.S.2d 354 (2d Dep't 2005) ("evidence of a specific medical diagnosis or course of treatment may be relevant to the issue of damages" but "is not essential to the prosecution of such an inherently genuine claim . . . and its absence does not preclude recovery" (citing *Johnson v. State*, 37 N.Y.2d 378, 382 (1975)). The New York Court of Appeals has not spoken on the issue.

A federal court, confronted with an issue of state law, is tasked with deciding how the highest court of the state would decide the issue. *Windsor v. United States*, 699 F.3d 169, 177 (2d Cir. 2012). Where the highest court has not addressed the issue, courts "may look to the decisions of the Appellate Divisions to predict what the New York Court of Appeals would do." *Iraq Telecom Ltd. v. IBL Bak S.A.L.*, 43 F.4th 263, 271 (2d Cir. 2022); *Statharow v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 321 (2d Cir. 1999) (decisions of intermediary courts serve as "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940))). In an unpublished order, the Second Circuit has held that summary judgment is appropriate in an IIED case where "plaintiff failed to introduce sufficient medical evidence to support such a claim." *Okudiani v. Rose*, 779 F. App'x 768, 772 (2d Cir. 2019) (summary order); *cf. Accettola v. He*, 2025 WL 843412, at *12 (S.D.N.Y. Mar. 18, 2025) (stating after trial, "[c]ourts routinely reject

claims for intentional infliction of emotional distress where the plaintiff fails to present medical evidence demonstrating severe emotional injury").

The Court accepts the notion that in a truly outrageous or extreme case, a claim for IIED may survive in the absence of medical evidence of emotional injury.  In those cases where courts have stated that medical evidence is required, the claim frequently has independently failed because the underlying conduct is not extreme or it has not caused the alleged emotional distress. *See Allam*, 906 F. Supp. 2d at 282–83; *Samtani*, 2015 WL 64671, at *15–16; *Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 566–67 (S.D.N.Y. 2012); *Woods v. Sieger, Ross & Aguire, LLC*, 2017 WL 395185, at *13–14 (N.D.N.Y. Jan. 27, 2017).  In those circumstances, the requirement that there be medical evidence has done no independent work.  In cases where the conduct has been truly extreme, courts have been prepared to relieve the plaintiff of any strict requirement that there be medical evidence.  *See Johnson*, 37 N.Y.2d at 382–83 (false notification of mother's death); *Plunkett*, 21 A.D.3d at 1022–23 (delay in notifying family of death and interference with possession of remains); *Doe v. Doe*, 2017 WL 3025885, at *7–8 (S.D.N.Y. July 14, 2017) (surreptitious sexual recording posted online); *Andrade v. Cultural Care, Inc.*, 706 F. Supp. 3d 348, 360 (E.D.N.Y. 2023) (hidden bedroom camera recording Plaintiff nude).  The Restatement of Torts does not require the evidence of severe emotional distress to take any particular form.  It requires instead the fact that the emotional harm be so severe that it is of the type that no reasonable person could be expected to endure and that is greater than even significant harm, Restatement (Third) of Torts § 46 cmt. j, and it permits the court to play a screening role to assure that the alleged harm is genuine before it is permitted to go to the jury, *see id.*, cmt. g.  The Restatement makes clear that "[t]he intensity and the duration of the harm are factors to be considered in determining its severity."  *Id.* at cmt. j.

34

Plaintiff relies on the testimony of Blanco that, as a result of the suspensions and discipline imposed on I.B., she could not sleep, that it was "a very dark and hopeless period in [her] life," and that she "couldn't concentrate at work." Dkt. No. 125 at 5 (quoting Dkt. No. 113-2 at 187). Blanco testified that the "whole ordeal" caused her anxiety attacks and that she "mentioned" the suspensions in therapy. Dkt. No. 113-2 at 191–93, 302–03.[12] Blanco also testified that the suspensions affected I.B. emotionally and he "had a very hard time expressing his emotions," and "would talk very negatively about himself." Dkt. No. 113-2 at 189–90. She said that the suspensions "made things very hard for [I.B.] socially, mentally, and emotionally" and it was "very difficult for him" to be "excluded" and "kicked out of the chess club." *Id.* at 169. Plaintiff also points to a social worker's notes of her visit with I.B. and Blanco that state in part: "the activation of 911/taking to the ED by 'mostly white teachers/staff' has been 'triggering and traumatizing' for pt and mother." Dkt. No. 143-6 at 124.

Even accepting that in some cases an IIED claim may survive in the absence of evidence from a medical doctor, Plaintiff has failed to present evidence of such severe emotional distress that could permit this case to go to a jury. This is not the kind of case in which severe emotional distress follows as a matter of universal human experience. A person who is falsely told her mother has died (*Johnson*), whose loved one's remains are withheld or mishandled (*Plunkett*; *Massaro*), or who discovers she has been secretly recorded nude and exposed to the public (*Doe*; *Andrade*) has suffered the kind of violation that no reasonable person would experience without severe distress. In those cases, the conduct supplies its own guarantee of genuineness. A parent no doubt may suffer serious emotional distress from the challenges of a child. Anxiety, sleepless

---

[12] Blanco testified that on one occasion she went to urgent care because she was having an anxiety attack. *Id.* at 302:18-23. She has submitted no evidence of such medical treatment.

nights, and distraction from work may follow.  But such harm is not greater than a reasonable person could be expected to endure in the challenges of parenting.  *Cf. Sylvester v. City of New York*, 385 F. Supp. 2d 431, 444 (S.D.N.Y. 2005) (denying summary judgment on IIED claim where children who witnessed shooting of their father were falsely detained by police, pressured to give false statements, and prevented from seeing their dying father—conduct whose nature guaranteed the genuineness of the resulting distress).  However, Plaintiff offers no diagnosis, no treatment records, no clinical assessment and no other evidence establishing that Blanco suffered emotional distress of the nature and severity the tort requires—distress "so severe that no reasonable man could be expected to endure it."  Restatement (Second) of Torts § 46 cmt. j; *see Benn*, 2021 WL 3193022, at *6 (granting summary judgment where "claim of emotional distress is unsupported by any medical or other evidence except his own conclusory statements.").

As to I.B., the record of severe emotional distress is even thinner.  His medical records do not conclude that suspensions or any other school conduct caused him emotional distress; they describe his ADHD symptoms and outbursts at school.  Dkt. No. 116 ¶ 139.  The only medical record mentioning the school's conduct reflects Blanco's own statement to a provider that calling EMS and placing I.B. in a separate room were distressing—not a medical conclusion to that effect.  Dkt. No. 116 ¶ 140.  Plaintiff relies on her testimony that the suspensions "amplified" I.B.'s ADHD and "caused him to shut down," Dkt. No. 113-2 at 189–190, that the 911 calls were "traumatizing," *id.* at 269, and that the suspensions generally were "very hard for him," *id.* at 168.  But a lay parent's testimony that school discipline was difficult for a child is insufficient, on its own, to create a triable issue of fact as to the child's emotional distress.  *See Samtani*, 2015 WL 64671, at *16 (granting summary judgment where Plaintiff had "not sought medical treatment in relation to this matter"); *Taylor v. Quayyum*, 2021 WL 6065743, at *9 (S.D.N.Y.

36

Dec. 21, 2021) (broad assertions of "mental anguish" insufficient to plead severe emotional distress for IIED claim); *Delaney v. Perez*, 2021 WL 3038642, at *7 (S.D.N.Y. July 16, 2021) ("Any allegations of suffering from severe emotional distress must be supported with objective evidence and not speculative claims" to state an IIED claim).

Plaintiff has failed to raise as a triable issue of fact whether Cohen engaged in extreme or outrageous conduct, intending to cause, or with reckless disregard of the likelihood of causing, emotional distress, and whether Plaintiff indeed suffered severe emotional distress. Defendants' motion for summary judgment as to Plaintiff's IIED claim is thus granted.

## II.     Section 504 of the Rehabilitation Act

Section 504 provides that "[n]o otherwise qualified individual with a disability" shall, "solely by reason of her or his disability," be excluded from participation in, denied the benefits of, or subjected to discrimination under a federally funded program or activity. 29 U.S.C. § 794(a). "To establish a *prima facie* case of discrimination under Section 504, a plaintiff must allege that: '(1) plaintiff is a qualified individual with a disability; (2) plaintiff was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by [the] public entity; and (3) such exclusion or discrimination was due to [plaintiff's] disability.'" *D.F. v. N.Y.C. Dep't of Educ.*, 2025 WL 1425752, at *10 (S.D.N.Y. May 16, 2025) (quoting *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016)); *see Biondo v. Kaleida Health*, 935 F.3d 68, 73 (2d Cir. 2019). Section 504's "central purpose is to assure that handicapped individuals receive 'evenhanded treatment' in relation to the nonhandicapped." *P.C. v. McLaughlin*, 913 F.2d 1033, 1041 (2d Cir. 1990) (quoting *Traynor v. Turnage*, 485 U.S. 535, 548 (1988)).[13] "Exclusion or discrimination may take the form of

---

[13] The Rehabilitation Act does not provide for individual liability. *See Goe v. Zucker*, 43 F.4th 19, 35 (2d Cir. 2022).

disparate treatment, disparate impact, or failure to make a reasonable accommodation." *B.C.*, 837 F.3d at 158. Discrimination may also take the form of deliberate indifference to a student's federally protected rights. *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 564 (S.D.N.Y. 2010).

Defendants do not dispute that I.B. is a qualified individual with a disability or that the Success Academy Defendants are subject to Section 504. Dkt. No. 111 at 23. Thus, to succeed on the Section 504 claim I.B. "must put forth evidence that [he] was 'denied a federal benefit because of his disability.'" *Pinn ex rel. Steven P. v. Harrison Cent. Sch. Dist.,* 473 F.Supp.2d 477, 484 (S.D.N.Y. Feb. 6, 2007) (emphasis omitted). Defendants claim that the evidence does not support a finding of discrimination under Section 504 under either a disparate impact theory or a failure to accommodate theory. *Id.* at 23–30. Plaintiff responds that a jury could find a Section 504 violation based on evidence that (1) the Success Academy Defendants failed to provide a service required by I.B.'s IEP, Dkt. No. 125 at 23–25; and (2) the Success Academy Defendants failed to make reasonable accommodations for I.B.'s disability, *id.* at 25–30.[14]

### A.     Failure to Implement the IEP

Plaintiff first argues that the Success Academy Defendants acted with deliberate indifference to I.B.'s federal right to a free appropriate public education ("FAPE") under the IDEA, 20 U.S.C. § 1400(d)(1)(A), by failing to provide paraprofessional services to I.B. and failing to inform the agency when the paraprofessional were absent. Dkt. No. 125 at 23–25.

A school violates the IDEA by failing to substantively provide the instruction and services described in an IEP. *See R.B. v. N.Y.C. Dep't of Educ.*, 15 F. Supp. 3d 421, 436–37

---

[14] Plaintiff does not respond to Defendants' argument that they have failed to establish disparate impact. Plaintiff has therefore abandoned any argument that the evidence supports a Section 504 claim based on disparate impact. *Jackson v. Fed. Express*, 766 F.3d 189, 197–98 (2d Cir. 2014).

(S.D.N.Y. 2014). In order to state a claim under Section 504 based on failure to provide educational services required by the IDEA, however, a plaintiff "must show something more than a mere violation of the IDEA." *D.F. v. N.Y.C. Dep't of Educ.*, 2025 WL 1425752, at \*10 (S.D.N.Y. May 16, 2025); *accord Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 334. (S.D.N.Y. 2005). It must show that the school acted with deliberate . . . indifference to the student's federally protected rights.'" *Bruckauf v. N.Y.C. Dep't of Educ.*, 2026 WL 861671, at \*5 (S.D.N.Y. Mar. 30, 2026) (quoting *Schreiber*, 700 F. Supp. 2d at 564); *see Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 115 (2d Cir. 2001) (discriminatory intent may be inferred "upon a showing of a statutory violation resulting from 'deliberate indifference' to the rights secured by the [IDEA]."). "[D]eliberate indifference is demonstrated by showing that the defendant appreciated that its conduct would run a serious risk of violating federal rights, but continued the conduct anyway." *Bruckauf*, 2026 WL 861671, at \*5 (quoting *A.H.* v. *N.Y.C. Dep't of Educ.*, 2025 WL 2773252, at \*12 (S.D.N.Y. Sept. 29, 2025)). "[P]laintiffs need not show defendants acted with animosity or ill will to support a claim under . . . Section 504." *Scaggs v. N.Y. Dep't of Educ.*, 2007 WL 1456221, at \*15 (E.D.N.Y. May 16, 2007) (collecting cases); *accord Bartlett v. N.Y.S. Bd. of Law Exam'rs*, 156 F.3d 321, 331 (2d Cir. 1998). At the same time, deliberate indifference cannot be shown by mere "negligence or bureaucratic inaction." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009). It requires evidence of "an official who at a minimum [1] has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf [2] has actual knowledge of discrimination in the recipient's program and [3] fails adequately to respond." *Biondo v. Kaleida Health*, 935 F.3d 68, 73 (2d Cir. 2019) (quoting *Loeffler*, 582 F.3d at 276); *see*

39

*also J.L, on behalf of J.P. v. N.Y.C. Dept. of Educ.*, 2024 WL 2700563, at *4 (S.D.N.Y. May 24, 2024).[15]

Plaintiff does not contend that the Success Academy Defendants themselves were responsible for providing the paraprofessional services specified in the IEP.  The school district's CSE, CSE-10, was responsible for the paraprofessional services.  Dkt. No. 143-12.  Plaintiff contends instead that when the paraprofessionals were absent, Defendants failed to communicate these absences to the agency responsible for providing paraprofessional support.  RSUF ¶¶ 41, 43, 46.  For support, Plaintiffs rely on the SED's finding that Harlem-2, as well as CSE-10, failed to provide the services provided for in I.B.'s IEP in violation of New York Education Law § 2853(4)(a).  Dkt. No. 125 at 24.

The SED's finding does not, in and of itself, support a conclusion that the Success Academy Defendants violated I.B.'s rights under the IDEA, much less that they acted with reckless disregard.  The SED found that there were 11 days between August and November 2022 when paraprofessional services were not provided to I.B. and "[t]he School did not submit any evidence to indicate that they informed CSE 10 about the days the paraprofessional was absent."[16]  *Id.*  On that basis, the SED found that Harlem-2 violated New York Education Law

---

[15] Where a plaintiff seeks relief under Section 504 for the failure to provide a FAPE under the IDEA, the plaintiff must generally exhaust administrative remedies as required by the IDEA. *See Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 168 (2017); 20 U.S.C. § 1415(l).  However, the IDEA's exhaustion requirement only applies if the relief sought is also available under the IDEA.  *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 147 (2023) ("The [IDEA's] administrative exhaustion requirement applies only to suits that 'see[k] relief . . . also available under' the IDEA." (quoting 20 U.S.C. § 1415(l)).  "Where plaintiffs are seeking a 'remedy . . . [that the] IDEA cannot supply,' such as compensatory damages, then section 1415(l) will not stand in their way."  *Derek S. v. Ballston Spa Cent. Sch. Dist.*, 2025 WL 3552714, at *2 (2d Cir. Dec. 11, 2025) (quoting *Luna Perez*, 598 U.S. at 147).  Here, Plaintiff seeks only damages and therefore I.B.'s claim under Section 504 is not barred by the failure to exhaust administrative remedies.

[16] Plaintiff also relies on the Daily Report from December 14, 2022, which notes that after

§ 2853(4)(a) requiring charter schools to provide students with special education programs and services in accordance with the IEP. *Id.* It did not find affirmatively that the school failed to inform CSE 10 about the absences. And, on this summary judgment record, the Success Academy Defendants have provided what, according to the SED, they failed to provide during that agency's review—affirmative evidence that they notified CSE-10 of the absences. Defendants have offered undisputed evidence that Harlem-2 staff promptly communicated with the agency to request a substitute. *See, e.g.,* Dkt. No. 113-29 (email requesting substitute on September 28, 2022 at 7:21 a.m.); Dkt. No. 113-34 (email informing Blanco that the school requested a substitute paraprofessional but the agency was unable to find coverage for paraprofessional's absence); Dkt. No. 113-32 (requesting substitute on December 14, 2022 at 8:14 a.m.); Dkt. No. 113-32 at 4 (requesting coverage on April 10, 2023 at 7:29 a.m.). At an October 25, 2022 meeting, which Blanco recorded, Marley Putt, Harlem-2's special education coordinator, explained that "as soon as a paraprofessional notifies me, I do reach out to the agency and request a substitute" and that she, a social-emotional learning specialist, another coordinator and the assistant principal are "on standby to support [I.B.] as needed." Dkt. No. 113-36. She further stated that she escalates the absence to the network team, who works with the agency to prioritize I.B. for an available substitute. Dkt. No. 113-26. Cohen also encouraged Blanco to reach out to the CSE if she wanted a second paraprofessional for I.B. DSUF ¶ 47; RSUF ¶ 47. The conduct does not bespeak a reckless disregard to I.B.'s federally-protected rights.

---

dismissal, Blanco requested that Cohen and Putt request a replacement paraprofessional. CSUF ¶ 41. However, Defendants have submitted an exhibit documenting that Harlem-2 staff requested a substitute paraprofessional at 8:14 a.m. on December 14, 2022. Dkt. No. 113-32. Thus, the evidence does not support Plaintiff's argument that the Success Academy Defendants waited until she raised the issue to request a replacement paraprofessional.

"The key issue" for determining a Section 504 claim is "not merely the length of time for which the deprivation of a FAPE persists, but the defendant's awareness of the ongoing deprivation and the extent of the failure to remedy." *D.F. v. N.Y.C. Dep't of Educ.*, 2025 WL 1425752, at *11 (S.D.N.Y. May 16, 2025). Harlem-2 promptly sought to remedy any gaps in paraprofessional support. Moreover, it is undisputed that on multiple occasions the lack of a paraprofessional was not due to Defendants' insufficient efforts to fulfill I.B.'s IEP, but rather because paraprofessionals quit or declined to continue working with I.B. after he became physically aggressive with them, leading to an increased need for substitutes. DSUF ¶ 44; RSUF ¶ 44; *see* Dkt. No. 113-31 (April 25, 2023 email seeking coverage after substitute paraprofessional did not feel comfortable returning); Dkt. No. 113-32 (email chain seeking replacement substitutes after two paraprofessionals stated they were uncomfortable working with [I.B.] due to his conduct within eight days). Harlem-2's prompt communication with the agency and responsiveness to gaps in I.B.'s support cannot support a finding of deliberate indifference. *See, e.g., Schreiber*, 700 F. Supp. 2d at 564–65 (granting summary judgment where the district "ultimately failed to provide a FAPE" but the undisputed evidence demonstrated that the district was responsive to parents' requests, convened committee on special education meetings, refined the recommendation in response to parents complaint, and reevaluated the student); *Pinn ex rel. Steven P. v. Harrison Cent. Sch. D.*, 473 F. Supp. 2d 477, 484 (S.D.N.Y. 2007) (finding no discrimination, even assuming the denial of FAPE, where defendant "never ignored [p]laintiffs['] request" for classification, "attempted to address" the issues raised, "sought out additional information," and "ultimately classified [the student]").[17]

---

[17] The cases Plaintiff relies on are inapposite. Dkt. No. 125 at 23. They each involve circumstances where the defendant failed to implement entire portions of a student's IEP for an extended period of time and/or maintained policies that deprived students of their recommended

B.      **Failure to Accommodate I.B.'s Disability**

Plaintiff also argues that Defendants failed to reasonably accommodate I.B.'s disability by responding to his disability-related conduct with suspensions, emergency calls, and hospital transports rather than with appropriate supports.

A failure-to-accommodate claim under Section 504 involves a burden-shifting analysis. The plaintiff first "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow the plaintiff to meet the essential requirements of the service, program, or activity at issue." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178 (2d Cir. 2015). The burden then "falls to the defendant educational-institution to persuade the fact-finder that the proposed accommodation is unreasonable." *Id.* The defendant can meet that burden "by establishing that the requested accommodation would (a) impose undue hardship on the operation of the defendant's service, program, or activity, or (b) require a fundamental or substantial modification to the nature of its academic program or standards." *Id.* An accommodation request that would require the school to make a "fundamental or substantial modification to the nature of [its] academic program" is not a reasonable accommodation. *M.F. by & through Ferrer v. N.Y.C. Dep't of Educ.*, 582 F. Supp. 3d 49, 58 (E.D.N.Y. 2022). A

---

services under the IEP. *See D.F.*, 2025 WL 1425752, at *11 (defendant inhibited parent's efforts to secure services, failed to comply with mandates and orders, and revoked student's speech and language therapy without alerting parent); *F.C. v. N.Y.C. Dep't of Educ.*, 2016 WL 8716232, at *14 (S.D.N.Y. Aug. 5, 2016) (finding plaintiff alleged bad faith or gross misjudgment where defendant failed to provide FAPE over a series of years, decertified plaintiff for all services without prior reevaluation, failed to provide evaluations before IEP meetings, and failed to implement portions of the IEP for an entire school-year); *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 518–19 (S.D.N.Y. 2013) (plaintiff had severe seafood allergy but defendant's proposed placement served seafood in cafeteria, defendant failed to recommend an alternative placement, and defendant failed to explain how the proposed placement could accommodate plaintiff's allergy); *S.W. by J.W. v. Warren*, 528 F. Supp. 2d 282, 290 (S.D.N.Y. 2007) (defendant instituted an arbitrary policy that limited the number of eligible service providers and adopted a policy of limiting therapy hours for autistic students).

defendant must "submit a factual record establishing that" when it rejected the proposed accommodation, it "diligently assessed" its reasonableness. *Dean*, 804 F.3d at 191.

Plaintiffs' claim is premised on the notion that the Success Academy Defendants failed to accommodate I.B.'s disability by issuing suspension notices when I.B. engaged in suspendable conduct. Dkt. No. 125 at 28. However, Plaintiffs failed to offer an accommodation to Plaintiffs' disability that Defendants did not take. *See Wells v. Achievement Network*, 2021 WL 810220, at *18 (S.D.N.Y. Mar. 2, 2021) (granting summary judgment on failure to accommodate claim where plaintiff "d[id] not explain what adjustments should have been made."). The issuance of the suspension notices themselves did not impose any burden on I.B. himself. Under the IDEA, the suspension notice issued to a student with a disability triggers procedural protections to ensure the student is not being disciplined for his or her disability, and requires that schools provide the child with a functional behavioral assessment, behavioral intervention services, and modifications designed to better address their disability. *Id.* § 1415(k)(1)(D), (E). Success Academy did so. Plaintiffs have identified no deprivations created by this process nor proposed a reasonable alternative that would better accommodate I.B.'s disability.

In any event, the proposed accommodation of eliminating suspensions as a disciplinary consequence is a request for a fundamental modification of the school's academic program, not a reasonable accommodation. Defendants have adduced evidence that the Code of Conduct is "an integral part of [the school's] academic program," Dkt. No. 112 ¶ 12, and that it applies equally to all students, Dkt. No. 116 ¶ 58. General assertions that the school should have "handled him differently" or used better de-escalation techniques do not identify an implementable accommodation that the school refused; they identify a different, though largely unidentified, philosophy of school management. Section 504 does not require a school to adopt the Plaintiff's

44

preferred philosophy.  *See M.F.*, 582 F. Supp. 3d at 58; *Fink*, 53 F.3d 565, 567 (2d Cir. 1995) (employer need not "provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable.").

Moreover, to the extent Plaintiff's argument could be generously construed to propose that Defendants utilize other methods to address I.B.'s behavior, the record shows that Defendants did not rely solely on suspensions and did in fact provide a range of supports to I.B., including an FBA and BIP, Dkt. No. 116 ¶ 12, counseling, breaks and preferred activities, and a calm-down box, *id.* ¶ 35, daily reports at Blanco's request, *id.* ¶ 19, and an ICT classroom placement, *id.* ¶ 17.  Plaintiff's disagreement is principally with the adequacy and consistency of those supports and with Defendants' simultaneous resort to suspension and emergency-response mechanisms.  But "the Rehabilitation Act does not require an educational institution to provide the accommodation a Plaintiff prefers." *M.F.*, 582 F. Supp. 3d at 55–56; *Fink*, 53 F.3d at 567 (reasonable accommodation does not "require the perfect elimination of all disadvantage that may flow from the disability").  A complaint that the school's chosen mix of interventions was insufficient, unwise, or disproportionate is a disagreement about educational judgment, not evidence that a proposed accommodation was unreasonably denied.

Plaintiff has failed to raise a triable issue of fact as to either theory of discrimination under Section 504.  Defendants' motion for summary judgment is therefore granted.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED.  The Clerk of Court is respectfully directed to enter judgment for Defendants and to close this case.

SO ORDERED.

Dated: June 10, 2026
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge

46